**PICKER FINANCIAL GROUP L.L.C., Appellant,**

v.

**HORIZON BANK, Appellee.**

**No. 8:03–CV–17–T–30EAJ.**

United States District Court, M.D. Florida, Tampa Division.

May 12, 2003.

Dawn A. Carapella, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A., Tampa, FL, Robin F. Frydman, Berger Singerman, Ft. Lauderdale, FL, for Picker Financial Group L.L.C.

Lynn V. Cravey, Ruden, McClosky, Smith, Schuster & Russell, P.A., Tampa, FL, for Horizon Bank.

## *ORDER*

MOODY, District Judge.

This is an appeal from the United States Bankruptcy Court, Middle District of Florida, and this Court has jurisdiction pursuant to 28 U.S.C. § 158. Factual findings of the Bankruptcy Court are accepted unless clearly erroneous and questions of law are reviewed *de novo. In re Patterson,* 967 F.2d 505 (11th Cir.1992). The Court has considered the briefs of the parties as well as their oral arguments. While the law in Florida is unclear, the Court determines that the Bankruptcy Court's Order, though correct under the view of some cases, is contrary to the present state of the law in Florida and must be reversed.

## *FACTS*

In November, 1996, Debtor borrowed money from American Bank ("American") and American duly recorded a UCC–1 financing statement perfecting its interest in various assets of the Debtor. Charles Connolly was at that time a vice-president and commercial loan officer at American. In February, 1999, Picker Financial Group LLC ("Picker") made a loan to Debtor and filed its UCC–1 perfecting its security interest covering the same assets.

Charles Connolly left American and, in October of 1999, became the president and chief executive officer at a new bank, Hori-

zon Bank ("Horizon"). To generate business for Horizon, Connolly solicited loans from his prior customers at American, including Debtor. American, obviously distressed by the solicitation of its customers by one of its former officers, adopted the policy of not doing business with Horizon. For example, when Horizon took away a customer and paid off that customer's loan with American, American would refuse to assign its security position to Horizon, and only accept payment, as it must, and then satisfy the loan. Horizon knew of this policy and therefore did not even seek assignments from American.

In February of 2000, Horizon loaned Debtor $800,000 and received a security interest in Debtor's assets. Before entering into this loan, Horizon's attorney performed a UCC–1 search which revealed Picker's second position security interest. Horizon's attorney gave the UCC–1 search to Connolly immediately before the loan closing, but Connolly failed to look at the search. When Horizon made the loan to Debtor, a portion of the loan proceeds were paid directly to American in full satisfaction of Debtor's obligation. American filed a UCC–3 form with the Florida Secretary of State acknowledging that it had released its security interest in the collateral.

In addition to constructive notice from the UCC–1 filings, Appellant asserts that Connolly also had actual knowledge. He knew that Debtor had borrowed money from Picker because Connolly had seen a reference to a loan from Picker in Debtor's financial records. The Bankruptcy Court found that Connolly did not "know" of Picker's security interest. This Court accepts the Bankruptcy Court's finding that Connolly did not have actual knowledge of Picker's security interest. It is undisputed that Connolly had constructive knowledge.

## DISCUSSION

■ The issue is simple: whether one who fails to look at a UCC–1 search showing the existence of a second position lienor is subrogated to the priority and security rights of the first lienor when it pays the indebtedness due to the holder of the first lien. One would expect this issue to have been long settled, but such is not the case. In fact, courts across the country, including Florida, are in considerable conflict. This lack of resolution is due largely because it arises from a court's equitable powers governed only by the case-by-case dispensation of justice to the parties.

### Traditional v. Liberal View

The Supreme Court of Utah in *Martin v. Hickenlooper*, 90 Utah 150, 59 P.2d 1139 (1936), surveyed subrogation cases · from many states and attributed the conflicting decisions to the lack of clear-cut rules of guidance.

> There is much confusion in the reasoning of the cases as far as stating a definite basis for allowing subrogation. This is for the simple reason that the court saw, through the minds of the chancellors who sat upon them, situations which they thought called for equitable relief without stating in clear-cut fashion the real basis for it—thus further illustrating that the application of the doctrine of subrogation is one depending primarily upon the inherent justice or equity of each particular case. It may also be remarked that while many of the decisions do homage to the requirement of an express or implied contract for subrogation as the basis for their decisions, it requires a very great stretching of the facts to find either.

*Martin*, at 1143.

In *Martin*, the Court distilled the confusion surrounding equitable subrogation into court's accepting one of two views.

Under the traditional view, constructive notice of a second position lienor prevented subrogation to the first lienor by a subsequent lender who paid off the first lienor.[1] Other courts, including the *Martin* Court, adopted the so called modern view.[2] Under the modern view, which this Court calls the pure liberal view, constructive notice is irrelevant and subrogation is allowed unless the intervening lender suffers some prejudice.[3]

These two conflicting views have given rise to directly contrary results not only in different states, but even in the same state. A good example of such contrary results can be found in equitable subrogation cases from Missouri. At the turn of century, Missouri followed the traditional view. *See Bunn v. Lindsay*, 95 Mo. 250, 7 S.W. 473 (1888).[4] In *Bunn*, the Missouri Supreme Court held that equitable subrogation did not apply to a lender who had constructive notice of an intervening lien. *See id.* at 476. By 1955, the Missouri Supreme Court had completely reversed its position and adopted the more liberal view of subrogation, holding that a lender

was entitled to subrogation without regard to his negligence in learning of an intervening lien. *See Anison v. Rice*, 282 S.W.2d 497 (Mo.1955). Recently, the Missouri Supreme Court changed yet again reversing back to the traditional view,[5] or perhaps a mixed view allowing some relaxation of the traditional view but disallowing equitable subrogation where there is constructive notice. *See Thompson v. Chase Manhattan Mortgage Corp.*, 90 S.W.3d 194, 207 (Mo.App.S.D.2002).[6]

### Differences in Terminology Used

Courts not only differ in their application of either the traditional or liberal view of subrogation, but also in their definition of the terminology involved. For example, it is often said (as it is in Florida) that equitable subrogation is not available to a mere volunteer. *Dade County School Board v. Radio Station WQBA*, 731 So.2d 638 (Fla.1999). But, what is a volunteer? Is a prospective lender who has no present interest in the property a "volunteer" when it makes a loan and pays off a prior

---

1. The *Martin* Court considered this view to be harsh and argued that the trend in more recent cases was to a more liberal view.

2. Of course, the "modern view" label is often ascribed to the view held by the authors of the opinion.

3. The underlying theory to the modern view is that one party's mistake should not create a windfall for an intervening lienor. The intervening lienor is entitled to what it bargained for—an intervening position.

4. In *Bunn*, a lender provided funds to pay off a first mortgage holder. The lender did not have actual knowledge that there was an intervening judgment lien properly recorded.

5. The Court stated in denying equitable subrogation: "the dilemma of the parties ... was caused by their failure to properly ascertain the state of the borrower's title, of which they were presumed to have knowledge." *Id.*

6. The Missouri Supreme Court in *Thompson* relied on an appellate court case, *Landmark Bank v. Ciaravino*, 752 S.W.2d 923 (Mo.App. 1988), which involved facts similar to the case at bar. In *Landmark Bank*, the Danzigs borrowed money from Landmark Bank to pay off a second mortgage. Landmark Bank secured the loan with what they believed after a title search was a second mortgage on a piece of real estate. The title company who did the title search failed to find the third mortgage that already existed on the property. Landmark Bank argued that it was equitably subrogated to the second mortgage holder that it paid off. In denying the bank's claim, the appellate court stated that no Missouri case existed in which subrogation was allowed to advance a lien holder in front of an already existing recorded lien holder in the absence of complicity by the superior lien holder in obtaining the loan.

lender intending to protect the interest it acquires? Yes, say some courts. *See Aetna Life Ins. Co. of Hartford v. Town of Middleport,* 124 U.S. 534, 8 S.Ct. 625, 31 L.Ed. 537 (1888) and *Boley v. Daniel,* 72 Fla. 121, 72 So. 644 (1916). No, say other courts. *See Anison v. Rice,* 282 S.W.2d 497 (Mo.1955) and *Federal Land Bank of Columbia v. Godwin,* 107 Fla. 537, 145 So. 883 (1933). There are cases in Florida on both sides of this issue.

Some courts say that even a volunteer is entitled to equitable subrogation. These courts base their reasoning on the prevention of a windfall to the intervening lienor. That is, if a new lender pays off the first lien, why should the second lienor receive a windfall by moving up to a first position when it would be where it had bargained to be by remaining in the second position if the new lender is subrogated only to the extent of its payment to the first lienor. This is the liberal view in its purest sense. In this view, constructive notice to the new lender is immaterial—even if the new lender is negligent in failing to examine the record, equity will offer its protection as long as other parties do not suffer. A good example of this view is found in *Rinn v. First Union National Bank of Maryland,* 176 B.R. 401 (D.Md.1995) wherein the Court explained:

> Whereas inexcusable neglect of the parties seeking subrogation may preclude relief, the mere fact that the party has in some respects been negligent, or been guilty of acts of omission, does not necessarily and in the absence of intervening equities defeat his right to subrogation. (Citations omitted). Especially where such ordinary negligence is as to the lender's own interest and does not affect prejudicially the interest of the person to whose rights he seeks to be subrogated, or where the negligence does not increase the burdens of any

lienholder, relief will not be barred. (Citations omitted).

176 B.R. at 411.

As pointed out in a recent Florida Fourth District Court of Appeal opinion, the Restatement has now adopted the liberal view:

> Under the *Restatement (Third) of Property: Mortgages § 7.6* cmt. e (1996), a refinancing lender is equitably subrogated to the priority of the first mortgage even where it has actual knowledge of the intervening lien:
>
> > Under this restatement, however, subrogation can be granted even if the payor (the refinancing lender) had actual knowledge of the intervening interest; the payor's notice, actual or constructive, is not necessarily relevant. The question in such cases is whether the payor reasonably expected to get security with a priority equal to the mortgage being paid. Ordinarily lenders who provide refinancing desire and expect precisely that even if they are aware of an intervening lien. A refinancing mortgagee should be found to lack such an expectation only where there is affirmative proof that the mortgagee intended to subordinate its mortgage to the intervening interest.

*Suntrust Bank v. Riverside National Bank of Florida,* 792 So.2d 1222, 1225 (Fla. 4th DCA 2001). Of course, the Restatement is not the law in Florida until it is adopted by the Florida Supreme Court.

In the case at bar, the traditional view favors Picker (the second position lienor) and the liberal view favors Horizon (the new lender with constructive notice). The Bankruptcy Court below followed the pure liberal view and understandably so because several cases seem to support that view as the present law of Florida. The Court now turns to Florida law.

## FLORIDA LAW

In *Boley v. Daniel*, 72 Fla. 121, 72 So. 644 (1916), the Florida Supreme Court clearly stated that when a lender on constructive, but not actual, notice of a second position lien loans money to pay off a first position lien, even with an understanding that it is to have a first lien on the property, equitable subrogation is not available to it. This is a strict traditional view.

In *Boley*, Lee Daniel loaned money to Brooks for the purpose of paying off a first mortgage on the property. In doing so, he failed to check the record and therefore had no actual knowledge of an intervening mortgage held by Boley. Further, Brooks told Daniel that he was getting a first mortgage on the property.

The Court in *Boley* began by explaining the difference between legal subrogation and conventional subrogation: [7]

> Subrogation arises by operation of law, where one having a liability or a right or a fiduciary relation in the premises pays a debt due by another under such circumstances that he is, in equity, entitled to the security or obligation held by the creditor whom he has paid. This is called "legal subrogation." Conventional subrogation depends upon a lawful contract, and occurs where one having no interest in or relation to the matter pays the debt of another, and by agreement is entitled to the securities and rights of the creditors so paid. (Citations omitted).

> As Lee Daniel was under no obligation whatever to pay the note that was secured by the first mortgage on the property given by Waters to Brooks, and had no interest in or relation to the property, there can be no legal subrogation of Daniel to the rights of the holder of the first note and mortgage. If there can be a subrogation, it must be a conventional subrogation, and based on an agreement of the parties that the first mortgage lien shall continue for the benefit of Daniel. An agreement between Daniel "and the mortgagors that he was to have a first lien on the property covered by said mortgage" is not necessarily an agreement that the first mortgage lien shall remain in force for the benefit of Daniel. It is true the money loaned by Daniel was obtained and used "for the purpose of paying up the mortgage" which was superior to Boley's mortgage; but as Daniel "had no actual notice or knowledge" of the second or Boley mortgage, he could not have contracted for a continuance of the first mortgage lien as having reference to Boley's mortgage.

72 So. at 645.

It should be noted that in *Boley*, constructive notice was more of a handicap to the new lender than would have been actual knowledge. The Florida Supreme Court used lack of actual knowledge to prevent any possible claim to conventional subrogation. And, since the lender was deemed a volunteer, there was no right to legal subrogation.

If the Florida courts had stopped with *Boley*, the resolution of the issue before the Court would be an easy one. One who fails to check the public records and therefore does not know of an intervening lien is not entitled to equitable subrogation. But, subsequent to *Boley*, Florida courts have moved toward the liberal view while still citing *Boley* as good law. It is confusing whether Florida has adopted the pure liberal view giving no regard to notice, or perhaps a mixed view which liberalizes the traditional view but still bars equitable

---

7. Courts around the country are in disarray as to what constitutes legal versus conventional subrogation, but the explanation in *Boley* is used in Florida.

subrogation when a lender fails to help himself by checking the record.

### Florida Law After Boley

The seeds of confusion were sown when the Florida Supreme Court next addressed the issue of equitable subrogation in *Federal Land Bank of Columbia v. Godwin*, 107 Fla. 537, 145 So. 883 (1933). Godwin borrowed money from the First National Bank of Perry (Bank of Perry) on July 13, 1926. A few months later, on September 6, 1926, Godwin borrowed money from F.G. Alderman (Alderman). On December 30, 1927, Godwin executed "a second mortgage" to the Bank of Perry to secure the renewal or extension of the mortgage of July 13, 1926. Then, on August 28, 1928, Godwin borrowed money from the Federal Land Bank of Columbia (Land Bank) to pay off the mortgage of the Bank of Perry, buy wire fencing, and repair houses on the property. In the Land Bank loan application, Godwin asserted that there were no other mortgages against the property, leading the Land Bank to believe that it would be the first lienholder. The Land Bank paid sufficient loan proceeds directly to the Bank of Perry to satisfy its note.

The Land Bank had secured an abstract of title to the property, but it showed no record of the mortgage held by Alderman. "Appellant in other words contemplated and made every effort in reason to locate and quiet all claims to said lands, and the mortgagor covenanted with appellants that the note and mortgage, when recorded, should be a first lien, as required by the Federal Farm Loan Association." 145 So. at 885. Under those facts, the Florida Supreme Court first allowed subrogation by the Bank of Perry's renewal mortgage, and then subrogation by the Land Bank to the Bank of Perry's first position, ahead of Alderman.

In *Godwin*, the Florida Supreme Court undeniably expressed a more relaxed view of subrogation than it did in *Boley*. For one, it made no mention of the distinction between legal subrogation and conventional subrogation. Instead, it described a basis for equitable subrogation that sounds a lot like the pure liberal view:

> The doctrine of subrogation does not arise from statute or custom, but is peculiarly a creation of equity, grounded on the proposition of doing justice to the parties without regard to form. It rests on the maxim that no one shall be enriched by another's loss, and may be invoked when and where justice demands its application. It has been greatly expanded in this country, may be employed to relieve from fraud or mistake, but is not allowed if it works any injustice to the rights of others. 25 R.C.L. § 2.

> Bottomed on this premise, it follows that under our system of jurisprudence there is no limit to the circumstances that may arise in which this doctrine may be applied. In *Forman, et al. v. First National Bank of Quincy, et al.*, 76 Fla. 48, 79 So. 742, we held that the doctrine of subrogation has been steadily expanding and growing in importance and extent in its application to various subjects and classes of persons, and that the agreement out of which it arises and upon which it rests may be express or implied.

Even the mention by the Court that the agreement may be expressed or implied seems to be a departure from *Boley* where the Court made a point that the lack of actual knowledge of the intervening lienor prevented any argument for an implied agreement to keep the first position alive for the benefit of the new lender.

Another difference from *Boley* is the characterization of a volunteer. The *Boley*

Court concluded that Daniel was a volunteer whereas the *Godwin* Court concluded that the Land Bank was not a volunteer. Both were new lenders who paid off a first mortgage. The only difference between the two was that Daniel did not even try to check the record. *Boley* said that it was the agreement that the first security should be kept alive for the benefit of the new lender that took away the character of a mere volunteer. It then said that where a new lender has no knowledge of an intervening lienor, it could not have even thought to keep the first position alive and therefore foreclosed that argument. *Godwin* appears to relax that rule, allowing the agreement to be implied even where there is a lack of knowledge.

*Boley* and *Godwin* also view the status of the intervening lienor differently. *Boley* describes the second position lienor as moving to first position at once, by operation of law, and the right to enforce it as such as being a "vested right." It then said, "[c]ourts of equity will not apply the doctrine of subrogation where to do so would be to deprive a party of a legal right." 72 So. at 645. *Godwin*, on the other hand, views the second position lienor as remaining in second position and as being unharmed if it does so.

A potentially crucial difference is whether the Land Bank in *Godwin* was on constructive notice of Alderman's loan. *Godwin* states that the Land Bank secured an abstract of title to the property, "but that it showed no record of the mortgage held by Alderman." 145 So. at 885. That could mean one of three things: 1) Alderman failed to record his lien, or 2) Alderman's lien was misrecorded either through his or the clerk's error so that it did not appear when one properly searched the record, or 3) Alderman's lien was properly recorded and the title company negligently failed to find it. *Godwin* does not tell us specifically which of the three circumstances existed. If Alderman's lien was in fact recorded and the title company failed to discover it, the Land Bank would still be on constructive, but not actual, notice—the same circumstances found in *Boley* except that in *Godwin*, at least the lender tried to help itself by looking at the record in an attempt to find other liens.

In the case at bar, Horizon astutely points out that constructive notice must have been present in *Godwin* or there would never have been a lawsuit. Had Alderman not recorded, the law is clear that the Land Bank would have had the superior position because it would have recorded first. At least one Florida Court agrees and construed *Godwin* as if the Alderman mortgage had been properly recorded, but the title company failed to find it. *Suntrust Bank v. Riverside National Bank of Florida*, 792 So.2d 1222 (Fla. 4th DCA 2001).

In *Riverside*, SunTrust had recorded a first mortgage in 1993. Two years later Riverside recorded a second mortgage, notifying SunTrust of the second mortgage and asking for a limitation of future advances. Three years after that, in 1998, SunTrust refinanced the first mortgage, paying off its original first mortgage from the proceeds and satisfying it of record. SunTrust assumed that the new mortgage was a first mortgage because its title search failed to disclose the Riverside mortgage.

The majority of the Fourth District, in an *en banc* decision, agreed that SunTrust was entitled to equitable subrogation. Interestingly, it described equitable subrogation broadly—saying "when loan proceeds are used to satisfy a prior lien, the lender stands in the shoes of the prior lienor, if there is no prejudice to other lienors." 792 So.2d at 1223. There is no mention of having to determine whether SunTrust

was a "volunteer" or whether there was a "contract" to keep alive the first position. This is a total adoption of the liberal view in its purest sense. The majority in this *en banc* opinion expressed its view to be in accord with *Godwin*. Judges Farmer and Gunther sharply disagreed that *Godwin* compelled this decision.

There can be no doubt that the majority in *Riverside* saw *Godwin* as supporting equitable subrogation even in the face of constructive notice, a stark departure from *Boley*. As a matter of fact, the majority opinion in *Riverside* does not even mention *Boley*, the seminal case in Florida on equitable subrogation. To avoid any misunderstanding about its adoption of the liberal view, the majority stated:

> We respectfully disagree with Judge Farmer's interpretation of *Godwin* in his dissent. His reading of *Godwin* would make the availability of the doctrine of equitable subrogation depend on how negligent was the party seeking to apply the doctrine. Yet in both *Godwin* and in the present case the second mortgage was of record, but the lender refinancing the first mortgage did not pick it up. We read *Godwin* as standing for the proposition that equitable subrogation will be granted to prevent unjust enrichment, even though the party seeking it was negligent, as long as there is no prejudice.
>
> ... The language we quoted from *Godwin* explains that the doctrine is "employed to relieve from fraud or mistake, but is not allowed if it works any injustice to the rights of others." *Godwin*, 145 So. at 885–86. The *Restatement (Third) of Property: Mortgages § 7.6*, e cmt. e (1996), supports our conclusion that SunTrust negligence does not preclude equitable subrogation.

792 So.2d at 1227, footnote 3. The Florida Supreme Court denied certiorari. *See Riverside National Bank of Florida v. Suntrust Bank*, 821 So.2d 300 (Fla.2002).

It is easy to see how the Bankruptcy Court below ruled in favor of Horizon, the new lender, in light of the reasoning in *Riverside*. If the majority opinion in *Riverside* is correct that the Supreme Court of Florida in *Godwin* intended to and did sweep aside the traditional view of equitable subrogation as set forth in *Boley* and adopted the pure liberal view of equitable subrogation, then Horizon should prevail in this appeal. But, like the strong dissent in *Riverside*, this Court does not interpret *Godwin* as a total abandonment of constructive notice as a factor in equitable subrogation. This Court considers *Boley* to still be good law in Florida because: 1) *Godwin* specifically distinguished *Boley* rather than reject it, 2) the Florida Supreme Court still cites *Boley* as being good law[8], and 3) the Florida statutory scheme compels at least the consideration of recordation in the public records as a significant factor in any application of equity.

First, *Godwin* did not purport to recede from *Boley*. In fact, it specifically distinguished it and said:

> (Boley) turned on the fact that Daniel was a volunteer, did not examine the record, was not the victim of false representations, was under no duty to pay the first mortgage, and exercised no care or effort to make his mortgage a first lien. The position of appellant in the case at bar is quite different. It was not a volunteer, it took every precaution possible to loan on a clear title, was only prevented from doing so by the fraud of the mortgagor; and had a contract which amounted to the right of subrogation.

8. *Dade County School Board v. Radio Station*

*WQBA*, 731 So.2d 638 (Fla.1999).

145 So. at 886. *Godwin* could not have stated much more clearly that its holding would have been different if, like here, the lender did not examine the record and was not the victim of false representations.

Second, Florida Courts are still citing *Boley* as good law in Florida. In particular, it is cited for the proposition that equitable subrogation is not available to a volunteer, and for its definition of a volunteer. *See e.g., Dade County School Board v. Radio Station WQBA,* 731 So.2d 638 (Fla.1999); *Eastern National Bank v. Glendale Federal Savings and Loan Association,* 508 So.2d 1323 (Fla. 3d DCA 1987). If *Boley* is good law, it bars equitable subrogation in the case presently before this Court.[9]

 Third, the Florida legislature has enacted a statutory scheme giving priority to the lien first recorded. This rule applies to both real and personal property.[10] Picker argues that equitable principles of subrogation apply to real but not personal property. That is incorrect. Equitable principles supplement the UCC where there is no direct conflict. F.S. 671.103 (1999). *See also Transamerica Insurance Company v. Barnett Bank of Marion County, N.A.,* 540 So.2d 113 (Fla.1989) and *Dade County School Board v. Radio Station WQBA,* 731 So.2d 638 (Fla.1999). The legislative policy behind these statutes is that there be some ordering of priorities not subject to undue judicial manipulation.

This policy, a factor to be considered in the application of equity, was served in *Boley* and should not be disregarded until the Florida Supreme Court makes a clear statement to the contrary.

*Godwin* could be read as a relaxation of the *Boley* rule on constructive notice allowing equitable subrogation where a new lender is assured by the borrower that there are no intervening liens and the new lender obtains a title search which fails to show otherwise. This view of *Godwin* would make it similar to the facts in and support the result of *Riverside*. But, it would not support equitable subrogation in a case like the one at bar where constructive notice appears in the record and the new lender just fails to look. That situation would still be controlled by *Boley* if it remains good law.

## CONCLUSION

This Court has attempted to explain in detail how several court opinions subsequent to *Boley* have called into question the law in Florida on equitable subrogation. This Court acknowledges that if these subsequent cases have in fact resulted in an abandonment of *Boley*, then the Bankruptcy Court is correct that equitable subrogation would apply here. But, the Florida Supreme Court has not yet taken that last, final step of saying that there is no consequence for a lender's failure to check the record. In the event the case at bar is appealed further, the Eleventh Cir-

---

9. But it should be noted that the Florida Supreme Court in *Dade County School Board,* 731 So.2d 638 (Fla.1999) also cites with approval *Eastern National Bank v. Glendale Federal Savings and Loan Association,* 508 So.2d 1323 (1987). *Eastern National Bank,* in dicta, recognizes two situations in which, it says, equitable subrogation will be allowed against intervening interests even where there is negligent failure to discover a prior recorded junior lien: "First, negligence which has not resulted in harm to anyone will not be invoked to permit unjust enrichment of the later

lienors through their fortuitous advancement in priority by reason of mistake.... Second, the function of constructive notice is to preserve an existing advantage and not to gain a new one." 508 So.2d at 1325. This dicta seems to completely eviscerate *Boley* even though it cites *Boley* with favor.

10. Florida Statute 695.11 as to real property and Florida Statute 679.312 as to personal property.

cuit might well wish to consider requesting the Florida Supreme Court to express the Florida law on this issue.

In spite of the existing uncertainties in Florida law, this Court is compelled to follow *Boley* until the Supreme Court has expressly receded from it. Equity helps those who help themselves and here Horizon did not even try to help itself. It made no attempt to review the title search that was available to it. What's more, allowing subrogation under the facts peculiar to this case would permit Horizon to accomplish indirectly through "equity" what it could not otherwise accomplish directly—to substitute itself into American's first position, a result which American purposefully rejected.

It is therefore ORDERED AND ADJUDGED that:

1. The Order of the Bankruptcy Court below is REVERSED. Horizon is not entitled to equitable subrogation to the position held by American.

2. This matter is REMANDED to the Bankruptcy Court for the entry of an Order consistent with this opinion.