IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Philadelphia Housing : 
Development Corporation, : 
          Appellant : 
  : 
  : 
    v. : 
  : No. 1981 C.D. 2012
Kevin Willoughby : Submitted: May 14, 2014

BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
               HONORABLE BERNARD L. McGINLEY, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
               HONORABLE RENÉE COHN JUBELIRER, Judge
               HONORABLE ROBERT SIMPSON, Judge
               HONORABLE MARY HANNAH LEAVITT, Judge
               HONORABLE P. KEVIN BROBSON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE McGINLEY               FILED: August 28, 2014

        Philadelphia Housing Development Corporation (PHDC), appeals from the portion of an order of the Court of Common Pleas of Philadelphia County (trial court) that entered judgment in the amount of $50,000 in favor of Kevin Willoughby (Willoughby) on his unjust enrichment counterclaim following a non-jury trial.

        This appeal arose out of an action brought by PHDC against Willoughby in order to quiet title on property at 1973 North 73rd Avenue in Philadelphia (Property).  PHDC originally acquired the Property in fee simple from the U.S. Department of Housing and Urban Development in 1984.  (Joint Statement of Uncontested Facts (J.S.U.F.) ¶1, Reproduced Record (R.R.) at 107a.)

In 1986, PHDC transferred title to the Property to Daryl Ruffin and Shirl Headen for $13,900. (Id. ¶2, R.R. at 107a.) The conveyance to Ruffin and Headen was in fee simple determinable subject to the condition that Ruffin and Headen "both occup[y] the premises and retain[] legal and equitable ownership continuously for a period of ten (10) consecutive years." (October 31, 1986 Indenture of Deed, PHDC Trial Ex. P2.) If Ruffin and Headen failed to comply with this condition, title would automatically revert to the PHDC. (Id.)

In 1997, PHDC initiated a quiet title action in the Court of Common Pleas of Philadelphia County against Ruffin and Headen for failure to comply with the conditions of their purchase of the Property. Ruffin and Headen did not appear to defend the suit, and, by an order dated May 29, 1998, title of the Property reverted to PHDC. (May 28, 1998 Order, R.R. at 9a-10a; August 16, 2012 Trial Court Order Findings of Fact (F.F.) ¶1.) That order was recorded at the City of Philadelphia (City) Department of Records on August 12, 1998. (May 28, 1998 Order, R.R. at 9a.)

On November 28, 2007, Ruffin purported to convey the Property to Willoughby by an indenture of deed. (Nov. 28, 2007 Indenture of Deed, R.R. at 13a.) Ruffin alone was identified as the grantor on that deed; Headen was not mentioned in the instrument. (Id.) The deed listed the consideration paid for the conveyance as $1, although the fair market value for tax purposes was listed as $6,645.20. (Id.; Real Estate Transfer Tax Certification, R.R. at 17a.) Willoughby recorded the deed on January 18, 2008. (Nov. 28, 2007 Indenture of Deed, R.R. at 13a; J.S.U.F. ¶4, R.R. at 108a.)

According to Willoughby, the Property was a dilapidated "shell" in 2007 at the time he "purchased" it from Ruffin, and Willoughby alleged he subsequently performed a substantial rehabilitation of the Property to bring it into a habitable condition. (Aug. 16, 2012 Order F.F. ¶¶2, 3.) In 2009, Willoughby listed the Property for sale and entered into an agreement of sale with one prospective buyer in August of that year for $139,900, however that sale was not consummated. (J.S.U.F. ¶¶9-10, R.R. at 108a; Sept. 23, 2009 Agreement of Sale, R.R. at 47a.)

Following the attempted sale, Willoughby's attorney wrote a letter to PHDC seeking assistance in obtaining clear title to the Property, in which the attorney admitted that Willoughby had not performed a title search and had not procured title insurance at the time of the purchase from Ruffin. (PHDC Trial Ex. P5; J.S.U.F. ¶12, R.R. at 108a-109a.) Willoughby also entered into negotiations to purchase the Property for $52,000, a price determined from a retrospective appraisal of the Property's value prior to Willoughby's improvements, but he did not follow through with PHDC. (PHDC Trial Exs. P6-P9, P11-P12; J.S.U.F. ¶¶12-24, R.R. at 109a-110a.)

Without the consent of PHDC, Willoughby then entered into an 18-month term lease with two tenants beginning on July 11, 2010. (J.S.U.F. ¶¶25-26, R.R. at 110a.) The lease provided the tenants with the option to purchase the Property within the lease period. (J.S.U.F. ¶25, R.R. at 110a.)

On April 7, 2011, PHDC posted a notice to vacate the Property, at which point PHDC discovered that Willoughby had rented the Property. (J.S.U.F. ¶27, R.R. at 110a.) PHDC commenced an action to eject Willoughby's "tenants."

3

(J.S.U.F. ¶27, R.R. at 110a)  Prior to the tenants leaving the Property, Willoughby collected approximately $14,000 in rent.  (Aug. 16, 2012 Order F.F. ¶3.)  In the summer of 2011, PHDC again offered to sell the property to Willoughby, who initially expressed interest but again failed to follow through on the purchase. (J.S.U.F. ¶¶29-30, R.R. at 110a-111a.)

PHDC filed its action to quiet title on the Property in the trial court on July 26, 2011, and Willoughby filed a counterclaim for unjust enrichment based upon improvements made while he was in possession.  A two-day bench trial was held in July 2012.

At trial, PHDC presented the testimony of Joan Decker, the City's Records Commissioner, who testified that the May 29, 1998 Order was properly recorded on August 12, 1998, within the deed book and that the recording of the Order was sufficient to notify the public that ownership of the Property reverted back to PHDC. (Notes of Testimony, July 19, 2012 (N.T. 7/19/12) at 67-68.)[1] Commissioner Decker further testified that the May 29, 1998 Order was recorded and indexed in the manner of a deed.  (N.T. 7/19/12 at 69-74; Notes of Testimony, July 24, 2012 (N.T. 7/24/12) at 22-24.)

Willoughby testified that he lived in the same neighborhood as the Property and, prior to the purchase, he initially posted letters on the front door of the Property and requested the owner to contact him to discuss a sale.  Several months after posting the note, Ruffin contacted Willoughby and represented himself as the owner.  (N.T. 7/19/12 at 112-15.) Willoughby further testified that

---

[1] The transcripts are not part of the reproduced record.

4

he did not perform a title search at the time of his purchase of the Property from Ruffin. Rather, he conducted an "online search" of the City's Department of Revenue database, which listed Ruffin as the owner of the Property and owing property taxes and Water Department bills. (N.T. 7/19/12 at 116-17.)

Willoughby testified that he paid $9,000 in cash for the Property and agreed to list the sale price as $1 on the deed because Ruffin "did not want to pay taxes on the property, on the money that I gave him." (N.T. 7/19/12 at 115, 117, 133.)

The real estate agent who listed the Property on Willoughby's behalf in 2009 testified that Willoughby was unable to consummate the sale of the Property in 2009 because the title report showed a mortgage in favor of PHDC and the agent could not obtain a pay-off statement for that mortgage. (N.T. 7/19/12 at 155-57; N.T. 7/24/12 at 16-17.)

There was conflicting testimony regarding the improvements made by Willoughby to the Property. Willoughby testified that before beginning the renovations to the Property he obtained a valid building permit from the City and took down the boards sealing the building to perform a clean out. (N.T. 7/19/12 at 118, 128.) Willoughby testified that when he unsealed the Property, he discovered fire damage, animal remains, a caved-in roof and falling bricks. (N.T. 7/19/12 at 118-19.) Two contractors who worked on the Property also testified that the Property was in a "condemned" state with damage from fire and exposure to the elements. (N.T. 7/19/12 at 77-78, 95-98.)

5

The two contractors testified that Willoughby paid them each $10,000 and $21,000 for the work they performed on the Property. (N.T. 7/19/12 at 80, 85, 87, 99-100.) Willoughby also testified regarding various contractor expenses associated with the renovations to the Property and explained that he spent $90,916 in total. (N.T. 7/19/12 at 118-24.)

Willoughby's real estate agent testified that when he listed the Property for sale in 2009 it was in an excellent condition and that the Property was appraised for $140,000 at that time. (N.T. 7/19/12 at 152-53; N.T. 7/24/12 at 6-11.)

A PHDC Inspector testified that when he first inspected the Property in 2011 there were "plumbing issues that were unsanitary, weren't done properly. There were electrical hazards that were not done properly." (N.T. 7/24/12 at 42.) A section of pipe was missing which allowed toilet water to "dump into the garage." (N.T. 7/24/12 at 43.) There was no "fuse protector." There was no "main breaker." (N.T. 7/24/12 at 45-46.) "A lot of items inside the house were not working" such as "receptacles, lighting." In some cases, there was "no device connected to the end, it was just exposed wiring." The Inspector testified that this was a "potential fire hazard." (N.T. 7/24/12 at 46-47.) The Inspector also testified that the electricity had been wired to "bypass" the electrical meter "so it was not actually recording any usage." (N.T. 7/24/12 at 48-49.) The "gas meter and water meter" were "jumped just like the electric meter." (N.T. 7/24/12 at 48-49.) The Inspector testified that the only reason these meters were bypassed "would be to steal electricity." (N.T. 7/24/12 at 57.)

The Inspector estimated that PHDC had spent or would need to spend approximately $16,000 to fix the problems resulting from Willoughby's poor workmanship. (N.T. 7/24/12 at 44-48.) The Inspector further estimated the cost of the improvements to bring the Property from a shell to the condition at the time PHDC took back possession in 2011 was approximately $80,000 to $90,000. (N.T. 7/24/12 at 42.)

Following trial, the trial court entered an order finding that: (i) title of the Property reverted to PHDC in 1998 and remained in PHDC thereafter; (ii) PHDC had not made any improvements to the Property and that it was an uninhabitable shell in 2007 when Ruffin purported to convey the Property to Willoughby; (iii) Willoughby had restored the Property to a habitable condition with the most reasonable estimate of the cost of those improvements at $80,000 to $90,000; and (iv) Willoughby had collected approximately $14,000 in rent and that PHDC invested approximately $16,000 in later repairs on the Property. (Aug. 16, 2012 Order ¶¶1-3.) The trial court entered judgment in favor of PHDC on the issue of ownership of the Property and for Willoughby on the unjust enrichment claim, with an award of $50,000 based on the amount spent by Willoughby on the rehabilitation of the Property offset by rents collected and repairs by PHDC. (Id. ¶4.)

PHDC filed a motion for post-trial relief and challenged the unjust enrichment award, which was denied by the trial court on October 4, 2012. PHDC appealed and the trial court issued an opinion in support of the judgment on February 5, 2013. In the opinion, the trial court stated that it accepted Willoughby's testimony as credible and that Willoughby "reasonably believed that he was the owner of the [P]roperty" at the time of the renovations and that he had

7

"specifically researched to see that the purported owner of the [P]roperty owed property taxes and an old water bill." (Feb. 5, 2013 Opinion at 2.) The trial court further stated that PHDC was on notice of Willoughby's mistaken belief of ownership when he inquired with PHDC about clearing the title. (Id.) The trial court concluded that the unjust enrichment award was the "only reasonable solution to make" both parties whole. (Id. at 3.)

PHDC presents two issues on appeal.[2] First, PHDC contends that the unjust enrichment award was improper because Willoughby was not a "bona fide possessor" of the Property. Second, PHDC argues that the trial court improperly entered judgment in favor of Willoughby on his unjust enrichment claim because Willoughby acted with "unclean hands" with respect to his alleged purchase and ownership of the Property.

## I.

## **Unjust Enrichment**

Unjust enrichment is an equitable doctrine under which the law implies a contract when one party is unjustly enriched and requires that the enriched party pay the value of the benefit conferred by the other party. Commonwealth ex rel. Pappert v. TAP Pharmaceutical Products, Inc., 885 A.2d

---

[2] This Court's scope of review in an equity matter is limited to determining whether the trial court's findings of fact are supported by substantial evidence, whether an error of law has been committed, or whether the trial court abused its discretion. City of Philadelphia v. Urban Market Development, Inc., 48 A.3d 520, 522 n.3 (Pa. Cmwlth. 2012). An appellate court's standard of review of an equitable ruling of a trial court is rigorous; the appellate court should not substitute its own views for that of the tribunal below, but instead its task is to determine whether "a judicial mind, on due consideration of all the evidence, as a whole, could reasonably have reached the conclusion of that tribunal." Hess v. Gebhard & Co. Inc., 808 A.2d 912, 920 (Pa. 2002) (quoting Aiken Industries, Inc. v. Estate of Wilson, 383 A.2d 808, 810 (Pa. 1978)).

8

1127, 1137 (Pa. Cmwlth. 2005). A plaintiff alleging unjust enrichment must show: (i) the plaintiff conferred a benefit on the defendant; (ii) the defendant appreciated the benefit; and (iii) acceptance and retention of the benefit by the defendant would, under the circumstances, make it inequitable for the defendant to retain the benefit without paying for the value of the benefit. Id.; Wilson Area School District v. Skepton, 860 A.2d 625, 631 (Pa. Cmwlth. 2004), *aff'd*, 895 A.2d 1250 (Pa. 2006).

Critically, the doctrine of unjust enrichment does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff. Commerce Bank v. First Union Nat'l Bank, 911 A.2d 133, 143–144 (Pa. Super. 2006). The most significant element of the doctrine is whether the enrichment of the defendant was *unjust*. Id. The defendant is "unjustly" enriched where he or she receives the benefits wrongfully or passively. Wilson Area School District.

Here, there was no evidence whatsoever that PHDC received the benefits of Willoughby's improvements "wrongfully or passively" or "unfairly." On the contrary, the record establishes that PHDC was completely unaware of Willoughby's incursion onto the Property until after he unsuccessfully attempted to sell it to a third party. When PHDC finally became aware of Willoughby's "renovations" the PHDC was forced to: (1) initiate an action to eject two innocent and unsuspecting tenants; (2) expend time and thousands of dollars to correct and bring into code the major plumbing and electrical problems created by Willoughby; and (3) resolve issues with utilities that supplied the property with gas and electrical services which were not metered. By all accounts, much of the work performed by Willoughby was substandard which rendered the property

9

uninhabitable. According to an unfortunate "tenant" who lived there, her belongings were damaged from flooding due to leaking and broken pipes.

This is not a situation where the PHDC passively observed Willoughby mistakenly make improvements to its property only to reap the benefits. Looking at the big picture, the PHDC was thoroughly inconvenienced and burdened by the whole affair. PHDC had no idea of the fraudulent transfer from Ruffin to Willoughby until long after it took place and after Willoughby had performed work on the building.

At that point, the PHDC was forced to adjust its budget and timetable to rectify the problems created by Willoughby. It was also required to institute the civil action to quiet title. Any enrichment PHDC may have received in the end was not "unjust." On the contrary, it was unjust to permit Willoughby, who could have easily ascertained the identity of the Property's owner, to recover any amount he irresponsibly and imprudently expended to renovate a property which he was not 100% sure he rightfully owned. Any loss he suffered was his own doing.[3]

This Court also disagrees on a more basic level with the trial court's conclusion that Willoughby was entitled to equitable relief in the first place. It is generally accepted that equitable relief is available to those who help themselves.

---

[3] This Court rejects, as did the trial court, Willoughby's argument that recording of the May 29, 1998, Order was "defective notice." This Court concurs with the trial court, based on the testimony of the Commissioner, that anyone who researched the title records would have seen the May 29, 1998 Order and discovered that PHDC owned the Property. (Notes of Testimony, July 24, 2012, at 31)

See <u>Home Owners' Loan Corp. v. Crouse</u>, 30 A.2d 330 (Pa. Super. 1943). <u>See</u> <u>also</u> <u>Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.</u>, 520 F.3d 1116, 1129 (10th Cir. 2008) (citation omitted) ("equity will not help those who do not help themselves"); <u>Metro Motors v. Nissan Motor Corp. in U.S.A.</u>, 339 F.3d 746, 750 (8th Cir. 2003) (citation omitted) (no abuse of discretion where court refused to help party that "could have helped itself and did not"); <u>Picker Fin. Group L.L.C. v. Horizon Bank</u>, 293 B.R. 253, 263 (M.D. Fla. 2003) (declining to grant equitable relief where party made no attempt to review available title search, thus failing to discover an intervening lien); <u>Bear Stearns Mortg. Capital Corp. v. Am. Home Mortg. Inv. Corp. (In re Am. Home Mortg. Holdings, Inc.)</u>, 409 B.R. 284, 288 (D. Del. 2009) (party who failed to take timely actions to protect interests was not entitled to equitable relief) (citations omitted).

The facts of this case do not support a finding that Willoughby was an unknowing, unsophisticated purchaser. To the contrary, the record shows that Willoughby was experienced in dealing in real estate and owned <u>four</u> investment properties. When asked what he did to find out who owned the Property, Willoughby testified:

> A.     Went on line on the computer, to the bureau, typed the address and his [Ruffin] name came up.
> ****
> Q.     What else did you do?
>
> A.     That was it.

(N.T. 7/24/12 at 116-117.)

11

By any standard, merely conducting an online search of the City's Department of Revenue in an attempt to identify the title owner is so utterly contrary to Pennsylvania's real estate law and recording statutes that it is inexcusable. Finley v. Glenn, 154 A. 299 (Pa. 1931). Condoning or rewarding such a lackadaisical standard to assure proper title, as the trial court did, would set a dangerous precedent.

Willoughby could have easily avoided the entire situation by doing what is customary in a real estate transaction, namely, having a title search performed or retaining counsel. Willoughby alone was responsible for his losses because he did not take measures to protect his interests. Equitable relief was not appropriate here.

## II.

### Unclean Hands

This Court also agrees with PHDC's assertion that Willoughby was not entitled to equitable relief because of unclean hands.

The doctrine of unclean hands requires that one seeking equity must act fairly and without fraud or deceit as to the controversy at issue. Terraciano v. Department of Transportation, 753 A.2d 233 (Pa. 2000).

The record reveals numerous instances of palpable bad faith which directly related to the PHDC's action to quiet title and Willoughby's claim for unjust enrichment. For instance, even though Willoughby was fully aware that PHDC was the record owner of the property, he entered into an 18-month lease with two tenants in July of 2010. Willoughby deceivingly held himself out to be

the owner and gave the tenants an illusory option to purchase the property. He illegally collected $14,000 in rent. In addition, Willoughby admitted that he misrepresented the purchase price on the Deed from Ruffin in an attempt to avoid realty taxes on the transaction. Even the trial court recognized that there was the potential for "criminal liability." (N.T. 7/19/12 at 133) That alone was fraudulent and barred his right to equitable relief.

The Order of the trial court, to the extent that it awarded Willoughby an award based on "unjust enrichment," is reversed.

_____
BERNARD L. McGINLEY, Judge

13

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Philadelphia Housing : 
Development Corporation, : 
                Appellant : 
                 : 
          v. : 
                 :   No. 1981 C.D. 2012
Kevin Willoughby : 

# **O R D E R**

AND NOW, this 28th day of August, 2014, the Order of the Court of Common Pleas of Philadelphia County in the above-captioned case is hereby REVERSED.

                _____
                BERNARD L. McGINLEY, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Philadelphia Housing : 
Development Corporation, : 
                    Appellant : 
                                   : 
                v. : No. 1981 C.D. 2012
                                   : Submitted: May 14, 2014
                                   : 
Kevin Willoughby : 


BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
                 HONORABLE BERNARD L. McGINLEY, Judge
                 HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
                 HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE ROBERT SIMPSON, Judge
                 HONORABLE MARY HANNAH LEAVITT, Judge
                 HONORABLE P. KEVIN BROBSON, Judge

OPINION NOT REPORTED

DISSENTING OPINION
BY JUDGE LEAVITT                             FILED: August 28, 2014

        Respectfully, I dissent. The trial court held that the Property, which was rehabilitated by Kevin Willoughby at a cost of $90,000, belonged to the Philadelphia Housing Development Corporation (PHDC), but it also ordered PHDC to pay a reasonable amount for the Property's rehabilitation. But for Willoughby's efforts, PHDC's quiet title action would have resulted in its acquisition of a "shell" building marked by fire damage, animal remains, a caved-in roof and falling bricks, what one witness called a "condemned" condition. Appellate review of equitable orders is limited and deferential, and it does not permit the appellate court to substitute its judgment for that of the trial court. The

trial court fashioned an order to make both parties whole and in no way abused its discretion.  I would affirm.

The trial court's findings of fact, critical to its unjust enrichment award, are not in dispute.  In 2007, when Daryl Ruffin conveyed the Property to Willoughby, its fair market value was listed at $6,645 in the tax records although Willoughby paid $9,000.  Thereafter, Willoughby unsealed the Property and discovered its "condemned" condition according to the testimony of all who viewed the Property at that time.  Willoughby testified that his rehabilitation effort cost $90,000, and this cost was confirmed by PHDC's own witness, a PHDC employee.[1]  The real estate agent who listed the Property for sale in 2009 testified that it was in excellent condition and had an appraised value of $140,000.  In August of 2009, Willoughby entered into an agreement of sale for $139,000.  The sale was not consummated because a title search revealed that PHDC had an outstanding mortgage lien on the Property.

For its part, PHDC did nothing to the Property after it sold it to Ruffin and Headen in 1986 for $13,900.  When the two did not comply with the terms of their agreement with PHDC to live in the Property for ten years, title to the Property could revert to PHDC.[2]  In a May 29, 1998, court order, PHDC secured

---

[1] PHDC's inspector testified that PHDC would need to spend approximately $16,000 to address the plumbing and electrical issues that it had with Willoughby's construction.  However, the inspector estimated that Willoughby's improvements, which took the Property from a shell to the condition at the time PHDC took possession in 2011, cost between $80,000 and $90,000.  Willoughby testified about payments he made to a variety of contractors and his associated expenses, such as building permits, which totaled $90,916 in addition to the $9,000 he paid for the Property.  His testimony was credited by the trial court.

[2] Notably, PHDC filed its action more than 10 years after the 1986 conveyance to Ruffin and Headen, who did not defend against PHDC's claim to a reversion of title.

its reversionary interest in a default judgment. PHDC recorded its judgment but did not note its judgment on the deed to the Property, as is required by law.[3] Thereafter, PHDC took no steps to return the Property to a habitable condition, by sale or otherwise, in furtherance of its mission to revitalize Philadelphia neighborhoods.

The trial court entered judgment in favor of PHDC on the issue of the Property's title and for Willoughby on his unjust enrichment counterclaim. It awarded Willoughby $50,000 because "it would be inequitable for [PHDC] to enjoy the fruits of another's labor." Trial court op. at 3. In establishing this award, the trial court used PHDC's own valuation of Willoughby's repairs at $90,000; it then reduced that number by the rental income received by Willoughby and by the cost of electrical and plumbing repairs that PHDC intended to do. Again, the trial court used PHDC's own estimate of these repairs, *i.e.,* $16,000.

The majority concludes that Willoughby was not a "bona fide possessor" of the Property and acted with "unclean hands" with respect to his purchase and ownership of the Property. Essentially, the majority holds that the trial court abused its discretion. I believe the majority has strayed beyond the narrow bounds of appellate review in reaching these conclusions.

In reviewing an equitable order, the appellate court's standard of review is deferential. The appellate court should not substitute its own views for that of the tribunal below but, instead, determine whether "a judicial mind, on due consideration of all the evidence, as a whole, could reasonably have reached the conclusion of that tribunal." *Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 920 (Pa.

---

[3] See n.5, *infra.*

MHL-3

2002) (quoting *Aiken Industries, Inc. v. Estate of Wilson*, 383 A.2d 808, 810 (Pa. 1978)); *see also Lilly v. Markvan*, 763 A.2d 370, 372 (Pa. 2000).

The standards for an unjust enrichment are well settled. As our Supreme Court has explained,

> [i]t is a well settled doctrine of equity that when a bona fide possessor of property makes improvements upon it, in good faith and under an honest belief of ownership, and the real owner for any reason seeks equitable relief, the court, applying the familiar principle that he who seeks equity must do equity, will compel him to pay for the improvements to the extent that they have enhanced the value of the land.

*Stanko v. Males*, 135 A.2d 392, 395 (Pa. 1957). Stated otherwise, a party "who improves the real or personal property of another, acting by mistake, has a claim in restitution as necessary to prevent unjust enrichment." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT §10. *See also St. Sava Home v. Christopher*, 537 A.2d 69, 72 (Pa. Cmwlth. 1988) (indicating that courts should balance the equities of mistaken improver's right to compensation against unfairness of making true owner pay for improvements).

The majority acknowledges that the most significant element of the doctrine of unjust enrichment is whether the enrichment of the defendant was unjust. Majority op. at 9. This happens where the defendant receives the benefit "wrongfully or passively." *Wilson Area School District v. Skepton,* 860 A.2d 625, 631 (Pa. Cmwlth. 2004). I disagree with the majority's application of this standard as well as its conclusion that Willoughby was not a *bona fide* purchaser.

First, the record shows that with respect to the Property, PHDC was passive to the point of militant indolence. It did not post the Property with a friendly, "If you lived here, you'd be home by now. Call PHDC for more

information." It did not warn off trespassers with a less friendly sign. Willoughby, who lived in the neighborhood, had no idea who owned the Property and, thus, posted a notice on the Property asking the owner to contact him. Had PHDC done even an occasional drive-by, it might have seen and responded to Willoughby's notice. Instead, Ruffin responded to Willoughby's notice. PHDC may or may not have reached a deal with Willoughby in 2007, but in either case Willoughby would not have spent many tens of thousands of dollars on the Property and its restoration.

Second, the majority's stated reasons for rejecting the trial court's conclusion that Willoughby was a *bona fide* purchaser relate to the balancing of equities, not to the question of whether Willoughby was a *bona fide* purchaser. The majority notes that PHDC had to file a quiet title action, eject Willoughby's tenants and do more repairs.[4] The majority is dismissive of what it calls Willoughby's "renovations" and asserts that the work was "substandard" with respect to the electrical and plumbing work. Majority op. at 9. This is balancing of the equities, which is the job of the trial court, not the appellate court. Here, the trial court took all of the above-listed evidence into account as well as all the countervailing evidence to reach its conclusion that it would be "unjust" to reward PHDC for its decades of indolence. Accordingly, it fashioned an order to make both parties whole.

The real question is whether the trial court's finding of fact that Willoughby reasonably believed he owned the Property and, thus, was a *bona fide*

---

[4] This litany fails to consider the fact that PHDC's quiet title action was preceded by its demand that Willoughby pay $52,000 for the Property; that ejecting the tenants was its choice; and that the repairs, in total, cost $16,000.

purchaser is supported by substantial evidence. The trial court credited Willoughby's testimony on this point. Further, Willoughby received a deed from Ruffin, whose ownership of the Property was confirmed by tax and utility records, and Willoughby recorded that deed. There is no requirement that one must do a title search to qualify as a *bona fide* purchaser, as suggested by PHDC. More importantly, there is no evidence that a title search would have disclosed PHDC as the title owner of the Property. The title search done by Willoughby's buyer in 2009 disclosed only a mortgage in favor of PHDC, for which Willoughby's agent was unable to obtain a pay-off statement. Willoughby may have been careless, but this does not mean he was not genuinely mistaken, as found by the trial court. Indeed, Willoughby's payment of $9,000 for the Property followed by another $90,000 on repairs supports the genuineness of his belief. Courts have refused to allow equitable compensation where the mistaken improver has *actual* notice that the title to the property is in dispute. *St. Sava Home*, 537 A.2d at 72. Not even PHDC argues that Willoughby had actual notice that his title was defective.

Further, Willoughby did not have constructive notice of PHDC's interest. PHDC did not introduce any evidence about what a title search for the Property would have revealed had Willoughby done one. Instead, PHDC relied on Commissioner Decker's testimony that the May 29, 1998, Order was recorded.[5]

---

[5] PHDC cites Sections 1 and 2 of the Act of April 24, 1931, P.L. 48, 21 P.S. §§356, 357, to argue its recording gave all subsequent purchasers constructive notice of PHDC's interest in the Property. The provisions cited by PHDC, however, relate to the recording of "*agreements* in writing relating to real property situate in this Commonwealth by the terms *whereof the parties executing the same do grant, bargain, sell, or convey any rights or privileges of a permanent nature pertaining to such real property*." 21 P.S. §356 (emphasis added). The Order of May 29, 1998, did not purport to convey the Property, and there were no "parties" to any agreement. As explained on the tax disclosure attached to the Order: "This is a Court Order Confirming Reversion of Title. No Interest Is Being Conveyed." Reproduced Record at 11a.
**(Footnote continued on the next page . . . )**

However, the only testimony about a title search came from Willoughby's real estate agent, who testified that the title search performed when Willoughby attempted to sell the Property in 2009 revealed a mortgage in favor of PHDC. The deed produced by PHDC at trial did not contain a notice of its May 29, 1998, judgment, which is necessary to satisfy Section 1 of the Act of May 17, 1921, 21 P.S. §402, if PHDC wanted the world to have constructive notice of the fact that title had reverted to it.

In sum, PHDC did not prove that Willoughby had constructive notice of PHDC's interest in the Property. Further, there is ample evidence in the record to support the trial court's holding that Willoughby acted "in good faith and under an honest belief of ownership," *i.e.,* a *bona fide* purchaser. *Stanko,* 135 A.2d at 395.

I also disagree with the majority's conclusion that Willoughby acted with "unclean hands." The unclean hands requirement is

> far more than a mere banality. It is a self-imposed ordinance
> that closes the doors of a court of equity to one tainted with

---

**(continued . . . )**

The May 29, 1998, Order should have been recorded in accordance with Section 1 of the Act of May 17, 1921, P.L. 860, 21 P.S. §402, which puts a subsequent purchaser on record notice of

> any final judgment or decree … entered in any court in this Commonwealth [that] affects any deed or other instrument of record in the office of the recorder of deeds of any county.

*Id.* Two conditions must be satisfied: (i) the judgment must be recorded in the appropriate office of the recorder of deeds, and (ii) the judgment must be noted on the margin of the recorded copy of the deed affected by the judgment. Although Commissioner Decker's testimony established that the May 29, 1998, Order was recorded, that is not enough. The copy of the deed produced at trial by PHDC had no notation of the judgment. Further, the Act of May 17, 1921, requires indexing, in addition to recording, to establish constructive notice. *Mid-State Bank and Trust Co. v. Globalnet International, Inc.*, 735 A.2d 79, 85 (Pa. 1999).

iniquity or bad faith relative to the matter in which he seeks relief. This doctrine is rooted in the historical concept of a court of equity as a vehicle for affirmatively enforcing the requirement of conscience and good faith. Thus, while equity does not demand that its suitors shall have led blameless lives as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue.

*Lucey v. Workmen's Compensation Appeal Board (Vy-Cal Plastics PMA Group)*, 732 A.2d 1201, 1204 (Pa. 1999). Unclean hands is established "only where the wrongdoing of the plaintiff directly affects the equitable relationship subsisting between the parties and is directly connected with the matter in controversy." *Stauffer v. Stauffer*, 351 A.2d 236, 244 (Pa. 1976); *see also In re Estate of Pedrick*, 482 A.2d 215, 222-23 (Pa. 1984). Further, a court in equity may decline to apply the unclean hands defense where it determines from a review of the whole record that an inequitable result will be reached by its application. *Shapiro v. Shapiro*, 204 A.2d 266, 268 (Pa. 1964).

PHDC did not identify any acts by Willoughby that constituted "wrongdoing … directly affect[ing] the equitable relationship subsisting between the parties and … directly connected with the matter in controversy." *Stauffer*, 351 A.2d at 244. Several of the acts cited by PHDC – namely Willoughby's lease of the Property without the consent of PHDC and Willoughby's failure to consummate a settlement with PHDC – occurred long after Willoughby had purchased and made improvements to the Property. The lease was done before PHDC proved that its title was superior to Willoughby's. Other acts cited by PHDC, such as the misstated purchase price on the tax form associated with the purchase from Ruffin, involved tax collectors, not PHDC. They did not in any way affect the equitable relationship between PHDC and Willoughby.

Willoughby's actions with respect to the purchase and repairs to the Property demonstrate carelessness rather than the type of dishonest and fraudulent behavior that will act as a bar to an equitable remedy. *Jacobs v. Halloran*, 710 A.2d 1098, 1103-04 (Pa. 1998) (holding that personal injury defendant who falsely testified in deposition that she was not driver of automobile involved in accident was not entitled to benefit from judgment of *non pros* where false testimony caused delay); *see also Mazzitti and Sullivan Counseling Services, Inc. v. Department of Public Welfare*, 7 A.3d 875, 885-86 (Pa. Cmwlth. 2010) (holding that drug and alcohol addiction treatment provider had unclean hands and was not entitled to equitable relief against Commonwealth agency where provider had directly participated in a billing scheme to defraud that agency).

In any case, the unclean hands defense should not be invoked where the result will be unjust. *Shapiro*, 204 A.2d at 268. PHDC made no efforts to move the Property into appropriate hands or to put it into a habitable condition from 1998, when it exercised its right of reversion, until 2009, when it learned of Willoughby's improvements. The trial court concluded that it would be unjust for PHDC to reap the benefit of improvements to the Property without some payment for them. The court order was devised to "make [both parties] whole." Trial court op. at 3.

I cannot say that the trial court's order was not "reasonable" or the product of an abuse of discretion. I would affirm the order of the trial court.

_____
MARY HANNAH LEAVITT, Judge

Judge Simpson joins in this dissent.

MHL-9