735 A.2d 79

MID–STATE BANK AND TRUST CO., Appellee,

v.

GLOBALNET INTERNATIONAL, INC., Appellant.

Appeal of: Pamela K. Blesh (Johnson).

Mid–State Bank and Trust Co., Appellee,

v.

David E. Johnson and Jody Johnson, Appellants.

Appeal of: Pamela K. (Johnson).

Supreme Court of Pennsylvania.

Argued April 28, 1999.

Decided July 22, 1999.

556

Malcolm S. Mussina, Williamsport, for Pamela K. Blesh (Johnson), appellant.

Steven S. Hurvitz, State College, for Mid–State Bank.

Richard J. Callahan, Williamsport, for David & Jody Johnson.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

NEWMAN, Justice.

Pamela Blesh (Blesh) appeals an Order of the Superior Court that reversed an Order of the Court of Common Pleas of Clinton County (trial court) awarding her $304,944.18 from the proceeds of a sheriff's sale. We affirm.

### FACTUAL AND PROCEDURAL HISTORY

In 1985, Blesh was divorced from her husband David E. Johnson (Johnson). Pursuant to a March 19, 1986 Order of Equitable Distribution (Equitable Distribution Order), Blesh conveyed to Johnson her one-half interest in the marital business in exchange for $385,381.09, which Johnson was to

pay in equal monthly installments for fifteen years. As security for the award, the court imposed a lien on the business' assets and real estate (Property). The lien (1987 Judgment Lien) was reduced to a judgment by Blesh and, on the advice of the Clinton County Solicitor, the lien was recorded in the Clinton County Judgment Index on January 27, 1987.[1] On that same day, the deed by which Blesh conveyed to Johnson her one-half interest in the Property was recorded with the Clinton County Recorder of Deeds, with the following notation:

The parties were divorced on May 24, 1985, vesting title as tenants in common.

The Grantor herein is conveying her one-half interest only to the Grantee.

This is a conveyance between persons, formerly husband and wife, pursuant to a Court Order of Equitable Distribution and therefore not subject to Realty Transfer Tax.

In 1994, Johnson used the Property as collateral for a loan from Mid–State Bank and Trust Co. (Mid–State). Globalnet International, Inc. (Globalnet) provided surety of repayment. On August 24, 1994, Mid–State properly recorded its mortgage lien on the Property with the Clinton County Recorder of Deeds.

Meanwhile, by November of 1993, Johnson had stopped making the monthly payments required by the Equitable Distribution Order. Blesh attempted to enforce the terms of the Equitable Distribution Order through court intervention, and on September 14, 1994, she recorded the Equitable Distribution Order with the Clinton County Recorder of Deeds.[2]

Johnson eventually defaulted on the loan from Mid–State, and on August 18, 1995, Mid–State confessed judgment against Johnson and Globalnet. A sheriff's sale was scheduled to be held on December 6, 1995. On September 27, 1995,

1. Clinton County has no separate local rules governing recording of judgments.

2. As discussed, *infra,* Blesh's recording of the Equitable Distribution Order was a belated attempt to establish record notice of her interest in the Property.

Blesh filed a Praecipe to Revive the 1987 Judgment Lien, which had expired in 1992, five years after its issuance.[3] *See, e.g., Allied Material Handling Systems v. Agostini,* 414 Pa.Super. 175, 606 A.2d 923, 925 (1992) (Citations omitted) ("A judgment continues as a lien for five years from the date on which the judgment was entered. After five years, the lien becomes dormant if not immediately revived, although there is a five-year statute of limitations in which a party may revive its lien."). Blesh also filed a Petition to Intervene in Mid–State's foreclosure action against Johnson and a Motion to Stay the sheriff's sale.

The trial court initially stayed the sheriff's sale, but, on March 1, 1996, the court denied Blesh's Petition to Intervene and lifted the stay. The sheriff's sale was held on June 26, 1996, and Mid–State was the successful bidder. The sheriff then filed a Schedule of Distribution, proposing to distribute the entire proceeds of the sale to Mid–State. Blesh filed exceptions to the Schedule of Distribution, and the court accepted briefs on the matter.

In an Opinion and Order dated September 16, 1996, the trial court held that Blesh's 1987 Judgment Lien on the Property took priority over Mid–State's mortgage lien, and therefore the court ordered the sheriff to distribute to Blesh $304,944.18 from the proceeds of the sale. Mid–State appealed to the Superior Court.

In a published Opinion, the Superior Court reversed the Order of the trial court, holding that because Blesh's 1987 Judgment Lien had expired after five years and had not been revived at the time Mid–State recorded its mortgage lien, and Mid–State had neither actual nor constructive notice of Blesh's lien, Mid–State's lien took priority over Blesh's lien. *See Mid–State Bank and Trust Co. v. Globalnet International, Inc.,* 710 A.2d 1187 (Pa.Super.1998). Judge Tamilia dissented, concluding that Blesh's lien took priority pursuant to the doctrine of *custodia legis,* and that Mid–State did have con-

---

**3.** The 1987 Judgment Lien was recorded on January 27, 1987 and expired five years later, on January 27, 1992. Blesh did not revive the lien until September 27, 1995, more than three years after it expired.

structive notice of Blesh's lien. *Id.*, at 1194–97 (Tamilia, J., dissenting) ("Because the real property in question was the subject of a specific court Order of equitable distribution and because appellant had constructive notice of that Order, I would affirm the Order of the trial court.").

## ISSUES

On appeal to this Court, Blesh raises the following issues:

1. Whether the Superior Court majority erred in failing to consider the doctrine of *custodia legis.*

2. Whether the Superior Court majority erred in concluding that Mid–State did not have constructive notice of Blesh's lien.

3. Whether the Superior Court majority erred in holding that a reasonably diligent title searcher would not have searched back further than five years.

4. Whether the Superior Court majority erred in holding that the 1987 Judgment Lien was governed by 42 Pa.C.S. § 4303(a).

## DISCUSSION

### Issue One—Custodia Legis

█ Relying primarily on the dissenting opinion of Judge Tamilia, Blesh argues that the Property was held *in custodia legis* (under the wardship of the court) pending Johnson's compliance with the Equitable Distribution Order. Blesh begins her argument by citing the general rules that, "property subject to an order of court is *in custodia legis,* or under the wardship of the court, pending compliance with the order;" and that, "property so held is not subject to attachment by judicial liens." *Klebach v. Mellon Bank, N.A.,* 388 Pa.Super. 203, 565 A.2d 448, 451–52 (1989) (citing *Lappas v. Brown,* 335 Pa.Super. 108, 483 A.2d 979 (1984)). From these general principles she concludes that, "[s]ince the property in this action was the subject of a specific equitable distribution Order, it remained *in custodia legis* pending [Johnson's] com-

pliance with the divorce court's Order. As a result, [Blesh's] claims stemming from the equitable distribution Order should take precedence in the distribution of the proceeds from the sheriff's sale." *Mid–State Bank and Trust Co.,* 710 A.2d at 1195 (Tamilia, J., dissenting). Though seemingly logical, Pennsylvania caselaw does not support this analysis.

This Court has never addressed the issue, but the Superior Court has upheld the application of the doctrine of *custodia legis* in several divorce cases. *See Keystone Savings Association v. Kitsock,* 429 Pa.Super. 561, 633 A.2d 165 (1993); *Fidelity Bank v.. Carroll,* 416 Pa.Super. 9, 610 A.2d 481 (1992); *Klebach,* supra. Each of these cases, however, is distinguishable from the case at bar.

In *Klebach,* Mellon Bank entered a judgment against the husband on December 14, 1982, while the couple was "in the midst of a divorce proceeding." Two weeks later, the husband and wife entered into an equitable distribution agreement by which the husband agreed to convey his interest in the marital residence to the wife. On December 30, 1982, the divorce court entered a divorce decree and, pursuant to the equitable distribution agreement, ordered the husband to convey his one-half interest in the marital residence to the wife. Five days later, on January 4, 1983, the husband complied with the order and conveyed the property to the wife.

The wife subsequently filed an action to quiet title to the property, arguing that Mellon Bank had no valid lien on the property. The trial court agreed and entered judgment on the pleadings in favor of the wife. Mellon Bank appealed, and a majority of the Superior Court affirmed on the basis of, *inter alia,* the doctrine of *custodia legis.* The Superior Court held that:

> The entireties property in question was under the jurisdiction of the lower court pursuant to a divorce proceeding. This property was in fact the subject of a judicial order entered by the divorce court on December 30, 1982. As such, it was properly held *in custodia legis* until the parties to the action complied with the order of the lower court. . . .

The property in question was never subject to attachment by [Mellon Bank's] lien. From December 30, 1982 until January 4, 1983, the property was in the custody of the divorce court pending execution of a deed in compliance with court order. Mellon's lien therefore never attached, and the lower court in the instant case correctly granted [the wife's] request to quiet title by striking the lien.

*Klebach,* 565 A.2d at 451–52. Judge Johnson, however, "emphatically dissent[ed]" from the majority's conclusion, remarking that, "I find it startling that the Majority has concluded, without citation to any authority, that the real estate here in question 'was in the custody of the divorce court pending execution of a deed in compliance with court order.' "Klebach, 565 A.2d at 453. (Johnson, J., dissenting).

Regardless of whether the majority in *Klebach* was correct that the property was *in custodia legis* pending the husband's compliance with the divorce court's order of December 30, 1982, the holding of *Klebach* has no application here because the facts are plainly distinguishable. In *Klebach,* Mellon Bank entered its judgment and recorded its lien against the husband's property while the divorce proceeding was pending and before the marital property was equitably distributed. *Cf. Fidelity Bank,* 610 A.2d at 483 (Citations omitted) ("When appellant initiated the divorce action, all marital property was placed under the trial court's jurisdiction. As such, the property was *in custodia legis,* or under wardship of the court, pending the outcome of the divorce proceeding.... When the doctrine of *custodia legis* is applied to the facts of the instant case, it is apparent that the liens of the Bank do not attach to the marital home. Here, appellant filed for divorce on July 17, 1987; however, the bank did not enter a judgment against Mr. Carroll until March 18, 1988. Because the marital home was then under the court's jurisdiction, the Bank's judgment did not attach."). In this case, though, Mid–State's execution of judgment took place more than eight years after the divorce was final and the marital property was distributed. This difference in timing is crucial to the application of the doctrine

of *custodia legis,* as the concurring opinion in *Keystone Savings* demonstrates.

In *Keystone Savings,* the wife commenced an action for divorce and equitable distribution on December 4, 1985. On March 14, 1988, while the divorce proceedings were pending, Keystone loaned the husband sixty thousand dollars. The husband defaulted on the loan, and Keystone commenced an action against him to recover the sixty thousand dollars plus interest. On March 12, 1990, after the divorce, court entered a decree in divorce, but before the marital property was distributed, Keystone won a default judgment against the husband. Approximately two months later, on May 24, 1990, the divorce court entered an order of equitable distribution directing the husband to convey his interest in the marital residence to the wife. On June 1, 1990, Keystone attempted to execute on its default judgment, and the wife filed a petition to stay the sheriff's sale. The trial court granted the wife's petition and entered a permanent stay of the sheriff's sale. Keystone then appealed to the Superior Court.

The majority of Superior Court affirmed the order of the trial court, holding, *inter alia,* that:

> [T]he property in question was subject to equitable distribution proceedings in the lower court several years prior to Keystone's unsecured loan to [the husband]. As such, the property was *in custodia legis* and not subject to attachment by Keystone's judicial lien. [Citing *Fidelity Bank, supra;* and *Klebach, supra* ].

*Keystone Savings,* 633 A.2d at 168. Judge Beck concurred in the majority's opinion, but she strongly criticized their analysis of the doctrine of *custodia legis:*

> I am concerned that the majority opinion has expanded the doctrine to unprecedented proportions so that it encompasses all of a couple's property prior to equitable distribution proceedings in a bifurcated divorce. Whether the doctrine should be at all applicable to marital property in a divorce action is questionable. [Citing *Klebach, supra* (Johnson, J., dissenting) ]. Historically, the concept of *custodia legis*

addressed circumstances where a sheriff or other officer of the court was in possession of personal property as a result of an action in replevin. [Citing *Weicht v. Automobile Banking Corp.*, 354 Pa. 433, 47 A.2d 705 (1946) ]. It has also been held to apply to circumstances where law enforcement officers have searched a residence, seized drugs and cash therein and held the cash until time of trial. [Citing *Commonwealth v. Myers*, 298 Pa.Super. 272, 444 A.2d 1170 (1982) ]. . . .

A bifurcated divorce unfortunately can take years, sometimes more than a decade, to be fully litigated. I believe it would unjustly bind the parties' hands if all marital property were automatically deemed *custodia legis* during the entire divorce action.

*Keystone Savings,* 633 A.2d at 169–70 (Beck, J., concurring).

Judge Beck's concerns have particular significance under the circumstances of the instant case. In *Keystone Savings,* as in *Klebach* and *Fidelity Bank,* the holding of the court that the property was held *in custodia legis* was premised on the fact that Keystone made its loan and attempted to execute on its judgment while the divorce proceedings were pending and before there was equitable distribution of the marital property. Here, as noted *supra,* Mid–State's execution of judgment took place more than eight years after the divorce was final and the marital property was distributed. In fact, Mid–State had no relationship with Johnson nor any interest in the Property until more than seven years after Blesh conveyed the Property to Johnson pursuant to the Equitable Distribution Order. Thus, Blesh advocates not only "expand[ing] the doctrine [of *custodia legis* ] to unprecedented proportions so that it encompasses all of a couple's property *prior to* equitable distribution proceedings," she would have the doctrine apply for years *after* the marital property has been equitably distributed. This we refuse to do.

As Judge Beck suggests, it would be inequitable and impractical to encumber the property of parties to a divorce to the extent that Blesh advocates. It is well established that public policy favors the free alienation of real property. *See,*

*e.g., Lauderbaugh v. Williams,* 409 Pa. 351, 186 A.2d 39 (1962). In *Klebach,* where the total amount of time the property was held *in custodia legis* was five days, the interference with the free alienation of the real property was minimal. In this case, however, holding the Property *in custodia legis* for fifteen years or more would encumber the Property for an inordinate length of time. Such a result is inconsistent with both the history and purpose of the doctrine of *custodia legis* and the public policy of this Commonwealth. Accordingly, we hold that the Property was not *in custodia legis* when Mid–State recorded its mortgage lien and subsequently confessed judgment against Johnson.

### Issue Two—Constructive Notice

■ Blesh next argues that Mid–State had constructive notice of her 1987 Judgment Lien at the time Mid–State recorded its mortgage lien, and therefore the 1987 Judgment Lien takes priority. According to Blesh, a reasonably diligent title search would have revealed the existence of both the 1987 Judgment Lien and the Equitable Distribution Order itself. We disagree.

■ A party is on constructive notice of another's interest in real property where the party "could have learned by inquiry of the person in possession and of others who, they had reason to believe, knew of facts which might affect title, and also by what appeared in the appropriate indexes in the office of the recorder of deeds." *Lund v. Heinrich,* 410 Pa. 341, 346, 189 A.2d 581, 584 (1963). Furthermore, pursuant to 21 P.S. § 402,

> When any final judgment or decree . . . entered in any court in this Commonwealth, affects any deed or other instrument of record in the office of the recorder of deeds of any county, the recording of such judgment or decree, *and a reference thereto noted upon the margin of the record of said deed or other instrument, giving the court, the date, and the number and term thereof,* shall constitute record notice of such judgment or decree.

21 P.S. § 402 (emphasis added). Here, there was not sufficient information recorded in either the Clinton County Judgment Index nor the Clinton County Recorder of Deeds Index to put Mid–State on constructive notice of Blesh's interest in the Property.

The 1987 Judgment Lien was recorded in the Judgment Index, but it had expired two years before Mid–State recorded its mortgage lien and had not yet been revived. Thus, a search of the Judgment Index would not have shown a valid lien. A search of the Recorder of Deeds Index also would have been uninformative because there was nothing recorded in the Index to indicate that Blesh retained an interest in the Property. The deed noted that Johnson acquired the Property pursuant to an order of equitable distribution, but there was no mention of a lien and no reference "giving the court, the date, and the number and term" of the Equitable Distribution Order as required by 21 P.S. § 402. Blesh attempted to establish record notice of her interest in the Property by recording the Equitable Distribution Order, but she was too late to put Mid–State on notice because Mid–State recorded its mortgage lien on August 24, 1994, and Blesh did not record the Equitable Distribution Order until September 14, 1994.

■ Despite the futility of searching the recorded indexes, Blesh suggests that information available elsewhere should have led Mid–State to make inquiries that would have revealed her interest in the Property. In particular, she argues that the information recorded in the deed on January 27, 1987 was sufficient to put Mid–State on notice of the divorce and the existence of the Equitable Distribution Order, and that Mid–State's title searcher then should have searched court records to obtain copies of the divorce decree and the Equitable Distribution Order. Thus, under Blesh's rule, a title searcher who discovered any mention of a divorce or equitable distribution anywhere in a chain of title would then have a duty to seek unrecorded court records, some of which may be sealed, destroyed, or otherwise unavailable, to determine whether some unknown person may have an interest in the property. We agree with the Superior Court that such an

interpretation of what constitutes constructive notice "would place an undue and unrealistic burden on the record examiner," *Mid–State Bank and Trust Co.*, 710 A.2d at 1192, would contradict 21 P.S. § 402, and would undermine the efficacy of the entire recording system. Because Blesh's lien would not have been evident from a search of the recorded indexes, we hold that Mid–State did not have constructive notice of the 1987 Judgment Lien at the time Mid–State recorded its mortgage lien.

### Issue Three—Duty to Search Beyond Five Years

■ In its discussion of Mid–State's alleged constructive notice of the 1987 Judgment Lien, the Superior Court included the following footnote:

> Given the five year revival rule, logic dictates that a prudent search of the Clinton County Judgment Index on August 24, 1994 [the date Mid–State recorded its mortgage lien] would require one to look back no further than August 24, 1989. In the instant case, because [Blesh's] lien was reduced to judgment in January, 1987, and because [Blesh] did not revive that judgment until September, 1995, Mid–State's search of the Judgment Index in August, 1994, did not disclose the existence of [Blesh's] lien.

*Mid–State Bank and Trust Co.*, 710 A.2d at 1192, n. 2. Blesh argues that the Superior Court erred in holding that a reasonably diligent title searcher would search back no more than five years because there are "many reasons" why a search beyond five years would be necessary. This argument is of no moment.

First, the Superior Court's footnote is *dicta* that has no effect on its holding in the case. Second, the kinds of liens that survive for more than five years without need for revival, such as federal tax liens (which remain valid until paid) and municipal claims (which remain valid for twenty years) are not recorded in the Judgment Index. Third, and perhaps most important, regardless of whether Mid–State had searched back more than five years and had discovered the 1987 Judgment Lien, Mid–State still would not have known that

Blesh had a valid interest in the Property because the 1987 Judgment Lien had expired and had not yet been revived. Therefore, no matter how far back Mid–State had searched, the result would be the same.

### *Issue Four—Application of 42 Pa.C.S. § 4303(a)*

Finally, Blesh argues that the lien created pursuant to the Equitable Distribution Order is not an ordinary judgment lien, and therefore it is not governed by 42 Pa.C.S. § 4303(a)[4] or other rules of recording and revival. According to Blesh, Section 3502(b) of the Divorce Code, 23 Pa.C.S. § 3502(b),[5] makes her lien "more than a mere judgment lien" because, *inter alia*, the divorce court has the equitable power to enforce the lien throughout its fifteen-year duration. *See* 23 Pa.C.S. § 3502(e).[6] Blesh argues that there was no need to

---

**4.** 42 Pa.C.S. § 4303(a) provides that:

Any judgment or other order of a court of common pleas for the payment of money shall be a lien upon real property on the conditions, to the extent and with the priority provided by statute or prescribed by General Rule adopted pursuant to section 1722(b) (relating to enforcement and effect of orders and process) when it is entered of record in the office of the clerk of the court of common pleas of the county where the real property is situated, or in the office of the clerk of the branch of the court of common pleas embracing such county.

**5.** 23 Pa.C.S. § 3502(b) provides that, "[t]he court may impose a lien or charge upon property of a party as security for the payment of alimony or any other award for the other party."

**6.** 23 Pa.C.S. § 3502(e) provides that:

If, at any time, a party has failed to comply with an order of equitable distribution, as provided for in this chapter or with the terms of an agreement as entered into between the parties, after hearing, the court may, in addition to any other remedy available under this part, in order to effect compliance with its order:
(1) enter judgment;
(2) authorize the taking and seizure of the goods and chattels and collection of the rents and profits of the real and personal, tangible and intangible property of the party;
(3) award interest on unpaid installments;
(4) order and direct the transfer or sale of any property required in order to comply with the court's order;
(5) require security to insure future payments in compliance with the court's order;
(6) issue attachment proceedings, directed to the sheriff or other proper officer of the county, directing that the person named as

record or revive the 1987 Judgment Lien, and that her lien takes priority over Mid–State's mortgage lien by operation of the Divorce Code. This argument has no merit.

Blesh offers no authority, and we are aware of none, that indicates that a lien created pursuant to Section 3502(b) of the Divorce Code is exempt from the recording and revival requirements generally applicable to judgment liens. To the contrary, it has long been the law of this Commonwealth that the equitable power of a court cannot circumvent the statutory mandates relating to priority of liens:

> Our several statutes governing the lien of judgments are so direct and imperative that they admit of neither modification nor suspension, except at the hands of the Legislature; they are so explicit in terms that no court can mistake their meaning, and they are so imperative that the court cannot extend relief when their requirements have been overlooked or disregarded.
>
> . . .
>
> There is no room left for the operation of any equitable rule that would extend the lien of any such judgments beyond the statutory period, except as the statutory conditions have been met.
>
> The existence, validity, and extent of a judgment lien are matters purely legal, dependent upon statutory provisions; and if the lien fails at law, it cannot be aided in equity. Again, whenever the rights or situation of parties are clearly defined and established by law, whether it be common or statutory, equity has no power to change or unsettle those rights or that situation, but in all such instances the maxim, 'Equitas sequitur legem,' is strictly applicable. And again,

having failed to comply with the court order be brought before the court, at such time as the court may direct. If the court finds, after hearing, that the person willfully failed to comply with the court order, it may deem the person in civil contempt of court and, in its discretion, make an appropriate order, including, but not limited to, commitment of the person to the county jail for a period not to exceed six months;

(7) award counsel fees and costs;

(8) attach wages; or

(9) find the party in contempt.

courts of equity are as much bound by positive rules and general maxims concerning property as are courts of law, and in the administration of assets equity does not interfere with absolute legal priority.

*Scott v. Waynesburg Brewing Co.*, 256 Pa. 158, 161–62, 100 A. 591, 591–92 (1917). Therefore, regardless of the fact that the 1987 Judgment Lien originated in a divorce action, it was incumbent on Blesh to record and timely revive the lien to preserve its priority. She did not do so, and therefore the Superior Court properly concluded that the mortgage lien of Mid–State took priority.

## CONCLUSION

After reviewing each claim of Blesh, we find that none has merit. Accordingly, we affirm the Order of the Superior Court.

Justices ZAPPALA and NIGRO concur in the result.