J-S23019-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| LOVELOVINGLOVE, INC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| URBAN PROPERTY SOLUTIONS, LLC | : | |
| | : | |
| Appellant | : | No. 338 EDA 2020 |

Appeal from the Judgment Entered January 9, 2020,
in the Court of Common Pleas of Philadelphia County,
Civil Division at No(s):  No. 170400258.

BEFORE:   LAZARUS, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:          **FILED OCTOBER 8, 2021**

Urban Property Solutions, LLC ("the Real Estate Company") appeals from the judgment entered, partially in its favor and partially in favor of LoveLovingLove, Inc. ("the Charity").  Following a non-jury trial, the trial court quieted title to a piece of land ("the Property[1]") in the Charity, because (1) the Charity acquired title first and (2) the Real Estate Company was not a subsequent *bone fide* purchaser for value.  The trial court also ruled in favor of the Real Estate Company on its counterclaim for unjust enrichment.  For the reasons that follow, we affirm.

In April of 2017, the Charity sued the Real Estate Company and Thomas L. Miller for quiet title to two properties, including the one at issue here.  The Real Estate Company denied the Charity's claims of ownership and asserted a

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The Property is at 675 North 41st Street, in the City of Philadelphia.

counterclaim of ownership of both properties. Failing that, it alternatively brought a counterclaim for unjust enrichment, because the Real Estate Company claimed to have paid certain liens on the properties.

Mr. Miller, who received service of process, did not participate in this matter. The trial court therefore entered default judgment against him. Thus, he no longer owns either property.

The matter proceeded to a bench trial, where the court found the facts to be as follows:

> [The Charity] was incorporated in 2009 by [Rashida] Ali-Campbell . . . to improve Philadelphia communities and to build an "Earthship" out of recycled cans and tires to help meet the needs of the residents. This Earthship would provide a poor neighborhood with a garden for growing fresh food that the community could receive for free and a rain-water filtration system.
>
> [The Real Estate Company] is a holding company that is used to purchase properties that are subject to liens and other encumbrances, such as overdue taxes, water bills, and other debts. Levar Clark [owns it]. At trial, both Levar . . . and Javar Clark ("Mr. Clark"), an employee of [the company], testified on [its] behalf.

> **A. Miller Conveys the Property to [the Charity]**
>
> [W]hile Ms. Ali-Campbell was participating in a radio interview discussing the Earthship, [Thomas L.] Miller called the radio station and offered to donate two of his properties to [the Charity]. The two properties were the Property and [another parcel on] 62nd Street. Mr. Miller could not immediately locate the original deeds to the properties, but he signed a hand-written agreement, dated August 29, 2013, to donate the properties to [the Charity], and he also told Ms. Ali-Campbell that he would contact her once he found them. N.T. at 25, 26-27; **see also** Exhibit P-1, Handwritten Agreement Between Mr. Miller and Ms. Ali-

Campbell to Donate Both Properties, Executed and Dated 8/29/2013).

In August 2014, approximately one year later, Mr. Miller called Ms. Ali-Campbell, to notify her that he found the original deed to the Property.

Ms. Ali-Campbell used language from the Original Deed for the Property to draft a deed conveying the Property from Mr. Miller to [the Charity]. On August 19, 2014, Mr. Miller signed and had notarized the Typed Transfer Deed to the Property. The Typed Transfer Deed to the Property lists Thomas L. Miller as the grantor and [the Charity] as the grantee of the Property.

[A few months later, they repeated that process with respect to the 62nd Street Property. Ms. Ali-Campbell never recorded either deed on behalf of the Charity.]

## B. Miller Conveys the Property to [the Real Estate Company]

On October 5, 2015, despite having already conveyed both deeds to [the Charity], Mr. Miller entered into an agreement of sale with [the Real Estate Company] regarding both properties for a total of $2, but with the condition that [the Real Estate Company] would satisfy all liens and encumbrances on the properties. That same day, Mr. Miller also signed deeds to convey the properties to [the Real Estate Company. It] had both [of its] deeds recorded with the Philadelphia Commissioner of Records on October 13, 2015 . . .

## C. [The Charity's] Possession, Signage, and Improvement of the Property

From 2013 to 2015, [the Charity] organized groups to clean the Property of trash and debris dumped on the lot, such as litter, toilets, and mattresses. [It] also continuously cut the grass and generally maintained the landscape of the Property. [The Charity] also erected different signs on the Subject Property.

First, a large, vinyl sign was erected in 2014, (a year after Mr. Miller conveyed the Property to [the Charity] and a full year before he conveyed [it] to [the Real Estate

Company]), and later a large, wooden sign in March of 2015, (seven months before Mr. Miller conveyed the Subject Property to [the Real Estate Company]). N.T. at 37, 40; *see also* Exhibit P-6 Photograph of Earth Ship Tire Ring/Foundation; Exhibit P-7 Photographs of Volunteers Working on Lot; Exhibit P-8 Photograph of Earthship Sign #1, Vinyl; Exhibit P-10 Photograph of Large Wooden Earthship Sign & Volunteers, Summer 2015; Exhibit P-11 Photograph #2 of Earthship Wooden Sign, Blueprint Sign, & Website, March 2015; Exhibit P-13, Photograph of Earthship Wall, and Signs of Principles and Website. The large, vinyl sign clearly states the following: "Environmentally Friendly Retaining Walls. Community Garden/Volunteer Driven Neighborhood Beautification Project" and includes a website for the Earthship. Exhibit P-8, Photograph of Earthship Sign #1; *see also* N.T. at 42.

The large, wooden sign on the Property displayed the name of [the Charity], [its] website address, blueprints, contact information, mission statement, names of volunteers and plans for the Earthship structure. [That] sign remained on the Property even throughout the time of trial. One of the signs clearly displayed the blueprint of plans and exact dimensions for the structure specifically drafted for the Earthship on the Property. N.T. at 38, 45, 77; *see also* Exhibit P-10 Photograph of Large Wooden Earthship Sign & Volunteers, Summer 2015; Exhibit P-11 Photograph #2 of Earthship Wooden Sign, Blueprint Sign, & Website, March 2015. The plans were custom-made for the [Charity] by an architect and approved by an engineer. In total, there were approximately six or seven signs installed and visible on the Property.

[The Charity] organized workshops with volunteer groups from the community and Temple University students to teach them how to turn tires and cans into the walls or foundation of the Earthship. [It] organized groups to begin building the Earthship garden walls out of the tires in a U-shape and neatly stacked the unused tires by size on the lot. [The Charity] also added to an existing garden on the lot and planted tomatoes, basil, and peppers.

[Ms. Ali-Campbell] spoke to the neighbors and business owners near the Property, notified them that [the Charity] was the new owner, and explained the Earthship

plan to them. A corner store next to the Property permitted [the Charity] to use its water and electricity during events and when groups were working on the lot. The corner store even displayed in its window one of [the Charity's] fliers to show support. Further, there was a large amount of publicity and media attention covering the Earthship and the project's progress, including on the radio, on cable, Mine TV, and also articles in *The Metro*, *The Philadelphia Inquirer*, Grid Magazine, and Philly.com, several of which mentioned the address of the Property . . .

[The Real Estate Company's agent,] Mr. Clark, . . . inspected the Property and observed evidence of [the Charity's] possession. He took three pictures of the Property prior to [buying the Property from Mr. Miller], all of which were entered into evidence *See* N.T. at 182-83, 184-85 Exhibit D-5. Mr. Clark . . . took the pictures from across the street and visually inspected the property while standing on the sidewalk next to the lot. The third picture [that he took appears below:



Real Estate Company's Ex. D.

That picture] shows a large, unobstructed, wooden sign situated on the left side of the lot with [the Charity's]

name, website address, and other information inscribed on it. In the same photograph, there is a smaller sign underneath the large sign that displays the blueprint diagram of the Earthship Project.

Mr. Clark testified that he did not see the large sign on the property, despite standing on the sidewalk next to the lot. [He] also testified that the Property looked like an "abandoned lot [with] a lot of trash," "debris," and tires "just thrown there." N.T. at 185, 188.

\*       \*       \*       \*       \*

[The trial court found] that the testimony of Mr. Clark lack[ed] credibility and [was] contradicted by the very photographs taken by him that day. First, Mr. Clark testified that he did not see the sign "at the time," despite its distinct visibility in the photograph that he himself had taken and submitted [into evidence]. N.T. at 189-90 ("Question: So, you just looked at the quote trash and debris, is that correct? Answer: Correct. Question: So, the signs meant nothing to you, is that right? Answer: I didn't pay any attention to them. So, I guess not."). Clearly prominent in the [above] photograph . . . is a large, wooden sign placed on the property by the [the Charity] that glaringly displays [the Charity's] name, contact information, website, mission for the lot, as well as rough plans for the structure it sought to construct on the Subject Property. *See* Exhibit D-5, Three Photographs from 2015; Exhibit P-10, Photograph of Large Wooden Earthship Sign & Volunteers, Summer 2015; Exhibit P-11, Photograph #2 of Earthship Wooden Sign, Blueprint Sign, & Website, March 2015; Exhibit P-13, Photographs of the Can Wall & Signage.

The testimony of Mr. Clark observing tires just "thrown there," plus "a lot of trash" and "debris" on the Property [was] also directly contradicted by the photographs taken by him that day. The photographs taken by Mr. Clark showed the tires located on the Property were arranged neatly into stacks ranging from two to nine tires high and by size, which strongly indicated they were not just illegally dumped on the property. *See* Exhibit D-5, Three Photographs from 2015. If the tires were just "thrown there" or illegally dumped, they would not be stacked neatly

- 6 -

by size and would likely be strewn about the Property. The second photograph taken by Mr. Clark also clearly shows the tires placed in a wall-like shape and staggered, with the second level offset from the first level, indicating some type of structure was being built there. *See* Exhibit D-5, Three Photographs from 2015. Additionally, absent from all three photographs is a visual of *any* trash or debris other than the tire stacks, which directly contradicts Mr. Clark's testimony and indicates that the Property was being maintained by a possessor. *See* Exhibit D-5, Three Photographs from 2015.

\* \* \* \* \*

[Finally, in support of its claim for unjust enrichment, the Real Estate Company] submitted copies of checks and receipts for the delinquent, Real Estate taxes in the amounts of $3,831.07, and also for the overdue water and sewer bills in the amount of $4,938.65. Exhibit D-8, Tax Review Board Bill and Receipt; Exhibit D-10 Receipt & Bill for Water, Sewer, and Real Estate Taxes ("Receipt for Water/Sewer & Taxes").

However, [the Real Estate Company] did not establish payment of the additional amount of $20,658.09 with any receipts or proof of payment, and instead only supplied a bill and copy of check from "BEAR & CO." Exhibit D-10, Receipt for Water/Sewer & Taxes. [The company] did not submit a receipt or other proof, as [it] did for the other amounts, that the check was ever paid toward a lien on the property. Further, the bill submitted as Exhibit D-9 has a section entitled "amount paid" that remains blank, indicating that [the Real Estate Company] did not send the amount due. Exhibit D-9, Delinquent Tax Statement Bill.

Trial Court Opinion, 12/29/20, at 4-8, 16-19 (emphasis in original) (some citations to the record omitted) (footnotes omitted).

Based on the foregoing facts, the trial court initially determined that the Real Estate Company had notice of the Charity's possession and ownership of the Property before buying it from Mr. Miller. Thus, the court ruled that the

Real Estate Company was not a subsequent *bona fide* purchaser of the Property. The court quieted title to the Property in the Charity.

Conversely, the trial court quieted title to the 62nd Street Property in the Real Estate Company because it deemed the company a subsequent *bona fide* purchaser of that parcel.[2] The court likewise ruled in favor of the Real Estate Company on its counterclaim for unjust enrichment. The court found that equity compelled the Charity to reimburse the Company for whatever liens upon the Property the Real Estate Company paid after buying it from Mr. Miller. In its non-jury decision, the trial court awarded the Real Estate Company $4,938.65.

The company filed post-trial motions seeking judgment as a matter of law. It renewed its request for title to the Property, and, in the alternative, it asked the trial court to increase its unjust-enrichment award to $31,087.46.

After reaffirming that the Real Estate Company was not a subsequent *bona fide* purchaser of the Property, the trial court granted, in part, the motion for additur. The court explained that "Upon reviewing Exhibit D-8, [the Real Estate Company] did submit a receipt for Real Estate Taxes paid on February 10, 2017, in the amount of $3,831.07; this was added to the original, unjust-enrichment award based upon Exhibit D-9, showing a receipt for payment of Real Estate Taxes and overdue water bills in the amount of $4,938.65 paid on

---

[2] The Charity has not appealed that portion of the trial court's decision.

May 23, 2017." Trial Court Order, 12/16/19, at 1 n.1. The court's post-trial increase brought the judgment against the Charity to $8,769.22.

This timely appeal followed.

The Real Estate Company raises three issues:

1. The trial court erred as a matter of law, because [the Real Estate Company] recorded its deed and [the Charity] did not; further, there was [no] evidence presented that [the Real Estate Company] was on record notice of a conveyance to [the Charity].

2. The trial court erred as a matter of law, because [the Charity's] evidence did not meet the high bar required to put [the Real Estate Company] on constructive notice of a possessory or equitable claim due to the condition of the lot and alleged signage at [the Property].

3. The trial court erred as a matter of law when it found that [the Charity] was unjustly enriched in the amount of $8,769.22, and not the full amount of $31,087.46 . . . .

Real Estate Company's Brief at 8. We address the first two issues together, because they both ask whether the Real Estate Company was a subsequent *bona fide* purchaser of the Property. We then address the third issue.

First, the Real Estate Company claims that the trial court erred, as a matter of law, because, in its view, it was a subsequent *bona fide* purchaser. However, the argument section of the Real Estate Company's Brief reveals that its dispute with the trial court's decision is a factual one that falls outside our scope of review.

When reviewing a non-jury decision our appellate role is limited:

to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law.

*Amerikohl Mining Co., Inc. v. Peoples Natural Gas Co.*, 860 A.2d 547, 549–50 (Pa. Super. 2004), *appeal denied,* 876 A.2d 392 (Pa. 2005) (citations omitted).

Finding that the physical appearance of the Property notified the Real Estate Company that the Charity possessed it, the learned Judge Nina W. Padilla of the Court of the Common Pleas of Philadelphia County opined as follows:

The main issue in this case is whether [the Charity] was in actual possession of the Property and whether the improvements by [the Charity] placed [the Real Estate Company] on constructive notice of [the Charity's] property interests. As described below, [the Charity] submitted extensive evidence of obvious possession and improvements on the Property, and therefore [gave the Real Estate Company] constructive notice of possession.

The general rule in Pennsylvania is that, in order for a land conveyance to be valid and transfer title, all deeds and conveyances must be recorded in the county where the land sits. The Pennsylvania Recording Statute, in relevant part, states the following:

All deeds . . . shall be recorded in the office for the recording of deeds in the county where such lands . . . are situate. Every such deed . . . which shall not be acknowledged or proved and recorded, as aforesaid, shall be adjudged fraudulent and void as to

any subsequent *bona fide* purchaser . . . without actual or constructive notice . . . .

21 Pa.C.S.A. § 351.

"The Pennsylvania recording statute . . . protects subsequent purchasers by giving a subsequent *bona fide* purchaser for value without notice of a prior transaction priority over the equitable estate of the first owner." **Long John Silver's, Inc. v. Fiore**, 386 A.2d 569, 572-73 (Pa. Super. Ct. 1978) (citing **Lund v. Heinrich**, 189 A.2d 581 (Pa. 1963)). To qualify as a *bona fide* purchaser, the subsequent buyer "(1) must be without notice of the prior equitable interests of others," **Long John Silver's**, 386 A.2d at 572-73 (citing **Overly v. Hixson**, 82 A.2d 573 (Pa. Super. 1951)); (2) "must pay valuable consideration . . . and (3) must act in good faith." **Poffenberger v. Goldstein**, 776 A.2d 1037, 1042 (Pa. Cmwlth. 2001) (emphasis in original) (citing **Carnegie Natural Gas Co. v. Braddock**, 597 A.2d 285, 288 (Pa. Cmwlth. 1991)).

Here, it is undisputed that [the Charity] did not record the deed for the Property and that [the Real Estate Company] did record [its] deed for the Property . . . However, [the trial court found that it was] not a *bona fide* purchaser, because [the Real Estate Company had] constructive notice of [the Charity's] possession.

In Pennsylvania, a subsequent purchaser is not a "*bona fide* purchaser" entitled to protection of the Recording Statute, if the purchaser is affected with constructive notice of possession. The law in Pennsylvania has long been settled:

Either actual or constructive notice is sufficient to prevent the subsequent purchaser from acquiring the status of a *bona fide* purchaser. Because constructive notice is **not** limited to instruments of record, **a subsequent purchaser may be bound by constructive notice of a prior unrecorded agreement.** This is true because the subsequent purchaser could have learned of facts that may affect his title by inquiry of persons in possession or others who the purchaser reasonably believes know such facts.

- 11 -

*Long John Silver's, Inc.*, 386 A.2d at 572-73 (emphasis added).

Therefore, "when a purchaser is affected with constructive notice he or she is no longer a *bona fide* purchaser and is no longer afforded the protection of the recording statute." *Malamed* v. *Sedelsky*, 80 A.2d 853, 855 (Pa. 1951). A subsequent purchaser is affected with constructive knowledge of facts that, at the time of purchase, "they could have learned by inquiry of the person in possession and of others who, they had reason to believe, knew of facts which might affect title." *Mid-State Bank & Tr. Co.* v. *Globalnet Int'l, Inc.,* 735 A.2d 79, 85 (Pa. 1999) (quoting *Lund,* 189 A.2d at 584).

In other words, "visible possession was notice of the title sufficient to put purchasers on notice and require inquiry upon their part." *Allison* v. *Oligher,* 14 A.2d 569, 569 (Pa. Super. 1940) (citing *Harris* v. *Bell,* 10 Serg. & R. 39, 43 (Pa. 1823); *Hymen* v. *Gatta,* 33 Pa. Super. 438, 440 (Pa. Super. 1907) ("An unrecorded deed, with possession taken thereunder and maintained, is sufficient notice to subsequent purchasers."; *Hottenstein* v. *Lerch,* 104 Pa. 454, 461 (Pa. 1883)); *see also Malamed,* 80 A.2d at 855 ("It is the duty of a purchaser of real property to make inquiry respecting the rights of the party in possession and failing to do so they are affected with constructive notice of such facts as would have come to his knowledge in the proper discharge of that duty.") (citing *Lazarus* v. *Lehigh & Wilkes-Barre Coal Co.,* 92 A. 121 (Pa. 1914); *Atlantic Refining Co.* v. *Wyoming Nat. Bank*, 51 A.2d 719, (Pa. 1947); *Sidle* v. *Kaufman,* 557, 29 A.2d 77 (Pa. 1942); *Kinch* v. *Fluke,* 166 A. 905 (Pa. 1933)).

Under Pennsylvania law, to constitute constructive notice, the possession must be exclusive, open, notorious, and distinct. *See Malamed,* 80 A.2d at 855 ("Excusive possession . . . was sufficient constructive notice."); *see also Overly,* 82 A.2d at 575 ("The possession of one holding under an unrecorded deed, in order to be effective as against a subsequent purchaser, must be open, notorious, distinct, and unequivocal.") . . .

Here, [the Real Estate Company] is not afforded the protection of the Recording Statute, because [it had]

- 12 -

constructive notice of possession by [the Charity,] and, therefore, is not a *bona fide* purchaser. Extensive evidence of [the Charity's] actual possession was submitted at trial to establish that [the Real Estate Company] was placed on constructive notice, including evidence submitted by [the company, itself].

[The trial court then provided a multiple-page list of facts supporting its finding of constructive notice to the Real Estate Company. These facts have substantial support in the trial record, and the Real Estate Company does not assert otherwise.]

[Also, the Real Estate Company] submitted evidence and testimony establishing possession by [the Charity] of the Property that was continuous, extensive, open, and notorious.

The following is a list of evidence submitted by [the Real Estate Company] at trial of the obvious possession by [the Charity] of the Property:

1. [Mr. Clark] inspected the property and observed evidence of [the Charity's] obvious possession.

2. [H]e took three pictures of the Property prior to purchasing the lot.

3. These pictures were admitted into evidence as Exhibit D-5.

4. Mr. Clark testified that he took the pictures from across the street and visually inspected the Property while standing on the sidewalk next to the lot.

5. In the third photograph of Exhibit D-5, even from across the street of the Property, clearly present in the left-hand corner of the lot is a large, wooden sign prominently displaying the name and website of [the Charity], and also a second sign with the blueprint for the Earthship. *See* Exhibit D-5, Three Photographs from 2015.

6. Mr. Clark testified that he did not see the large sign on the Subject Property despite standing on the sidewalk next to the lot . . .

- 13 -

7.    Mr. Clark also testified that the Property looked like an "abandoned lot with a lot of trash," "debris," and tires "just thrown there." (N.T. at p. 185:10-15; p. 188:18-25).

[As previous stated, the trial court rejected Mr. Clark's testimony of ignorance as incredible and contrary to the very photographs that Mr. Clark took of the Property.]

Therefore, the [Real Estate Company received] constructive notice of [the Charity's] possession of the Property and is not afforded the protection of a *bona fide* purchaser under the Recording Statute. [The Real Estate Company] had a duty to "make inquiry respecting the rights of the party in possession," and the failure to do so affects [the company] with "constructive notice of such facts as would have come to his knowledge in the proper discharge of that duty." **Malamed**, 80 A.2d at 855. The "visible possession" of [the Charity] is sufficient to put [the Real Estate Company "on notice and require inquiry upon their part." **Allison**, 14 A.2d at 569. After seeing the signs and other evidence of [the Charity's] possession, [the Real Estate Company] had a duty to inquire into the possessory rights of [the Charity] and failed to do so . . . .

Trial Court Opinion, 12/29/20, at 10-17 (some emphasis, punctuation, and citations omitted).

Notwithstanding the trial court's detailed, fact-driven analysis, the Real Estate Company contends that it "was without notice of the prior equitable interests of the [Charity]." *Id.* at 18. The company believes the "trial court erred in accepting evidence of a handmade, cryptic sign on the far reaches of the lot and activity well before [the Real Estate Company's] purchase of the Property as indicia of possession." *Id.* at 19. "A cryptic sign in 'reclaimed wood' that was admittedly vandalized and tires in a U-shape is not significant enough to put a purchaser on constructive notice of possession." *Id.* at 20.

These assertions reflect the Real Estate Company's self-serving view of the evidence, erroneously presented to this Court in the light most favorable to the company. This revisionist version of the facts ignores a simple truth: when reviewing a post-trial motion for judgment as a matter of law, this Court must "view [the] evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference." **Wilson v. Transp. Ins. Co.**, 889 A.2d 563, 569 (Pa. Super. 2005). The Real Estate Company's arguments that it had no notice of the Charity's possession go to the weight of the evidence, not to its sufficiency.

"[W]e dispose of this [issue] by noting that credibility determinations are for the finder of fact and, accordingly, in the case *sub judice*, the trial court was free to believe all, some, or none of [Mr. Clark's] testimony." **K.B. v. Tinsley**, 208 A.3d 123, 128 (Pa. Super. 2019). As discussed in the trial court's opinion, **supra**, the finder of fact determined that no reasonable person could have overlooked the Charity's two signs and its partial erection of the Earthship when Mr. Clark inspected and photographed the land. Indeed, the trial court found Mr. Clark's testimony that he did not notice those tell-tale hallmarks of the Charity's possession to be incredible. **See** Trial Court Opinion at 16-17.

Upon reviewing this cold record of conflicting factual contentions, we are unable to substitute our judgment of Mr. Clark's credibility (or, rather, his lack thereof) for the in-person observations of the trial judge. The Real Estate

- 15 -

Company's attempt to recast the record in its favor affords it no appellate relief. The trial court's fact-based judgment that the company had constructive notice and, therefore, was not a subsequent *bona fide* purchaser must be upheld on appeal.

The Real Estate Company's final assertion (that the trial court's post-trial grant of additur was insufficient) fares no better. Again, the company would have us substitute our view of the facts for that of the trial court. The Real Estate Company indicates it "testified that it paid the real estate tax sold by Department of Revenue to U.S. Bank . . . in the amount of $20,658.09." Real Estate Company's Brief at 22.

The trial court disbelieved that testimony, because the company "did not submit a receipt or other proof, as it did for the other amounts" that the trial court awarded. Trial Court Opinion, 12/29/20, at 18-19. In other words, the court accepted the written evidence of the Real Estate Company as proof of what it paid, but the court dismissed the company's testimonial evidence of what it allegedly paid as incredible.

Credibility determinations are not reviewable. *See K.B.*, *supra*.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/8/2021